**UNITED STATES**

v.

**Samuel R. ODOM, Private First Class (E–2), U.S. Marine Corps.**

NMCM 98 01404.

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 26 Sept. 1997.

Decided 27 April 2000.

---

528

Maj Dale E. Anderson, USMC, Appellate Defense Counsel.

LT James E. Grimes, JAGC, USNR, Appellate Government Counsel.

Before DORMAN, Senior Judge, TROIDL, Senior Judge, and ROLPH, Appellate Military Judge.

ROLPH, Judge:

At his general court-martial before officer and enlisted members conducted on various

dates in June and September 1997, the appellant was convicted, contrary to his pleas, of making a false official statement, assault consummated by a battery, and assault with intent to commit murder, in violation of Articles 107, 128, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 907, 928, and 934. He was sentenced to 10 years confinement, total forfeiture of pay and allowances, reduction to E–1, and a dishonorable discharge. In June 1998, the convening authority approved the sentence as adjudged and, except for the dishonorable discharge, ordered it executed.

We have carefully reviewed the record of trial, the appellant's seven assignments of error, and the Government's response. We have also carefully considered the outstanding oral arguments presented by appellate counsel in this case. Except as specifically noted below, we conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the appellant's substantial rights was committed. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).[1]

### Facts

During the early morning hours of 15 March 1997, as they returned from an evening in Tijuana, Mexico, Airman (AN) Travis A. Tarwater, USN, and AN Gary M. Grimwade, USN, became the victims of a senseless and unprovoked attack involving the appellant and two of his friends. The assaults occurred as they were crossing a footbridge separating the United States and Mexico. AN Tarwater and AN Grimwade did not know the appellant or his friends, and, from all indications, were randomly targeted. The appellant first approached AN Grimwade and, for no apparent reason, struck him in the face with his fist. Continuing up the footbridge, the appellant next confronted AN Tarwater, and ultimately knocked him to the ground and began beating him, with the assistance of one of his friends. During this vicious assault, AN Tarwater attempted to get back on his feet by putting his hands behind him on the bridge's 3–foot–high side

wall, lifting himself up by steadying himself against the low wall. As he got to his feet, the appellant ran at AN Tarwater and pushed him in the chest with both hands, knocking him over the wall and off the bridge. AN Tarwater fell approximately 13–and–a–half feet to the cement sidewalk below, landing on his head. He suffered a massive concussion and immediately lapsed into a coma. AN Tarwater was ultimately hospitalized for over 4 months, followed by an additional 3 months in a residential treatment program. AN Tarwater's injuries resulted in massive, permanent brain damage which, according to expert testimony, significantly impaired his mental processes and will require a lifetime of supervised care. He has since been medically discharged from the U.S. Navy with full disability retirement and placed into the custodial care of his mother and stepfather.

Mexican police immediately apprehended the appellant as he attempted to flee from the bridge. He was positively identified as AN Tarwater's and AN Grimwade's assailant by AN Grimwade.

### Denial Of Right To Civilian Counsel

In his first assignment of error, the appellant contends that his general court-martial conviction should be set aside because he was denied the counsel of his choice in violation of his Sixth Amendment rights. Specifically, the appellant asserts that the military judge erred when he disqualified both of his civilian defense counsel based upon their unwaivable conflicts of interest. Appellant's Brief of 9 August 1999 at 2–3.

Every criminal accused in the military justice system enjoys an absolute right to be represented by civilian counsel if provided at his or her own expense. Art. 38(b)(2), UCMJ. When the accused elects to be represented by civilian counsel, his "military counsel (detailed or selected) shall act as associate counsel unless excused at the request of the accused." *Id.* at ¶ (b)(4). At the initial session of his general court-martial, the appellant was represented by his detailed military

---

1. Assignment of Error VII has been thoroughly considered under the criteria of Rule for Courts-Martial 1210(f), Manual for Courts-Martial, United States (1995 ed.), and we find it to be completely without merit. It will not be further discussed in this opinion. The appellant's petition for a new trial is denied.

counsel, Major [P], USMC. Record at 3–4. He was also represented at this session by Ms. Virginia Clark, who represented that she was "associated with the Law Firm of Maxwell Agha as Head Counsel there." Record at 6. The appellant stated that he wanted to be represented by civilian counsel in addition to his detailed counsel, and that Ms. Clark and Mr. Agha would both be representing him. Mr. Agha was not present for this initial court-martial session. Ms. Clark stated on the record that she was "a member in good standing with the highest court in the state of California," and she was properly sworn. Record at 6; *see* RULE FOR COURT-MARTIAL 807, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.).

In correspondence the military judge received from civilian counsel in this case, it became abundantly clear that Ms. Clark and Mr. Agha intended to also represent the appellant's two co-accused, Lance Corporal [LCpl] Vivian and LCpl Waters. Record at 7. The military judge therefore initiated a "conflict inquiry" *sua sponte* to determine whether this situation created a conflict of interest for Ms. Clark and Mr. Agha that impeded their ability to properly represent the appellant.[2] *Id.*; *and see* Appellate Exhibits VI and VII. Ultimately, the military judge concluded that an irreconcilable potential conflict of interest existed. Record at 48. Despite the willingness of the appellant and his co-accused to expressly waive their right to conflict-free counsel in writing (*see* Appellate Exhibit VI), the military judge nevertheless disqualified both civilian counsel from further participation in the appellant's court-martial. *Id.*; Record at 66–70. Thereafter, despite being given over three months to locate and hire new civilian counsel, the appellant ultimately proceeded to trial represented solely by his detailed military defense counsel.

Ms. Clark had made appearances at Article 39(a), UCMJ, sessions in the courts-martial of the appellant and his two co-accused,

---

2. *See United States v. Breese,* 11 M.J. 17, 22 (C.M.A.1981), endorsing the procedure adopted by the Fifth Circuit in *United States v. Garcia,* 517 F.2d 272, 278 (5th Cir.1975), which requires that, in cases of multiple representation:

> [T]he court should seek to elicit a narrative response from each defendant that he has been advised of his right to effective representation, that he understands the details of his attorney's possible conflict of interest and the potential perils of such a conflict, that he has discussed the matter with his attorney or if he wishes with outside counsel, and that he voluntarily waives his Sixth Amendment protections.

*See also United States v. Smith,* 44 M.J. 459, 462 (1996)(Gierke, Judge dissenting). In *United States v. Curcio,* 680 F.2d 881, 889–890 (2nd Cir.1982), the following illuminating guidance was provided regarding conflict inquiries in multiple representation situations, and obtaining knowing and intelligent waivers of conflict issues:

> The first task of the trial court is to alert the defendants to the substance of the dangers of representation by an attorney having divided loyalties in as much detail as the court's experience and its knowledge of the case will permit. If each defendant persists in his request for joint representation, the court must assess whether the request is, as to each defendant, knowing and intelligent. This does not mean that the defendant must be able to predict with certainty which dilemmas will present themselves to counsel or how counsel will resolve them. Defendants need not be prescient. Nor need their decision be what an objective ob-

server would deem sensible, prudent, or wise.... Rather, the defendants must be informed, and they must have the capacity for making a rational decision.... If the defendant reveals that he is aware of and understands the various risks and pitfalls, and that he has the rational capacity to make a decision on the basis of this information, and if he states clearly and unequivocally ... that he nevertheless chooses to hazard those dangers, we would regard his waiver as knowing and intelligent and allow his choice to be honored out of respect for the individual which is the lifeblood of the law....

> In assessing the level of each defendant's comprehension of the dangers, the court may perhaps devise a variety of methods for gaining the necessary insights. On the whole, we think that questions designed to elicit from the defendant a narrative statement of his understanding are preferable to questions designed to elicit mere "yes" or "no" answers....

> [T]he court should advise the defendant of his right to separate and conflict-free representation, instruct the defendant as to the problems inherent in being represented by an attorney with divided loyalties, allow the defendant to confer with his chosen counsel, encourage the defendant to seek advice from independent counsel, and allow a reasonable time for the defendant to make his decision....

> [T]he court's inquiry in each instance should take place after the defendants have had a reasonable time to digest and contemplate the risks posed by joint representation.

and, in each, had represented that she was a member in good standing of the California Bar Association and was authorized to practice law in the highest courts in California. Adding a rather bizarre twist to the proceedings, it was later discovered that Ms. Clark was not an attorney at all, and that she had apparently perpetrated a fraud upon these courts-martial in representing herself as such. Record at 66–70; Appellate Exhibit XIX.[3] This disturbing fact was ultimately conceded by Mr. Agha, who "professed ignorance that she had been practicing law." Record at 67.[4]

The appellant, who does not now challenge the disqualification of Ms. Clark, nevertheless complains that the military judge erred when he refused to accept the appellant's waiver of Mr. Agha's conflict of interest, and subsequently disqualified him. The appellant suggests that the military judge had a duty to give Mr. Agha the option of relinquishing his representation of the appellant's two co-actors, thereby "eliminating" any conflict of interest and affording him his Sixth Amendment right to counsel of choice. We strongly disagree.

### Discussion

 We apply an "abuse of discretion" standard in reviewing the military judge's decision to disqualify Mr. Agha based upon what he determined to be an unwaivable conflict of interest. *Wheat v. United States*, 486 U.S. 153, 163–64, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988); *United States v. Lanoue*, 137 F.3d 656, 663 (1st Cir.1998). Whether an actual conflict of interest exists is a mixed question of law and fact requiring our *de novo* review. *United States v. Smith*, 44 M.J. 459, 460 (1996).

The United States Supreme Court has provided explicit guidance as to when criminal trial courts may refuse to accept an accused's proffered waiver of conflict-free counsel, and bar an accused from retaining an attorney who also represents one or more co-accused. In *Wheat v. United States*, the Supreme Court made it clear that the Sixth Amendment right to choose one's own counsel is not absolute:

> [T]he appropriate inquiry [in evaluating Sixth Amendment denial of counsel of choice claims] focuses on the adversarial process, not on the accused's relationship with his lawyer as such. Thus while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.

*Id.* at 153, 108 S.Ct. 1692 (citations and internal quotes omitted). A criminal court's legitimate interest in ensuring that trials are conducted within ethical and professional standards is a well-recognized limitation upon an accused's Sixth Amendment right. *Id.* at 160, 108 S.Ct. 1692. Applicable standards of professional conduct constrain counsel from representing multiple clients in the same case.[5] Representation of multiple co-

---

3. The military judge ultimately determined that a *prima facie* showing had been made that Ms. Clark, with the knowledge and possible assistance of Mr. Agha, had attempted to perpetrate a fraud upon the court-martial in representing on the record that she was an attorney licensed to practice law in the State of California. Record at 68–70. The detailed defense counsel, Major [P], concurred in the military judge's conclusion. *Id.*

4. The trial counsel indicated on the record that the State Bar of California was formally investigating Mr. Agha in regard to this matter. Record at 97–98.

5. *See* "Conflict of Interests," Judge Advocate General Instruction 5803.1B, Rule 1.7 (11 Feb. 2000):

a. A covered attorney shall not represent a client if the representation of that client will be directly adverse to another client, unless:
(1) the covered attorney reasonably believes the representation will not adversely affect the relationship with the other client; and,
(2) each client consents after consultation.
b. A covered attorney shall not represent a client if the representation of that client may be materially limited by the covered attorney's responsibilities to another client or to a third person, or by the covered attorney's own interests, unless:
(1) the covered attorney reasonably believes the representation will not be adversely affected; and
(2) the client consents after consultation. *When representation of multiple clients in a single matter is undertaken, the consultation*

accused in companion criminal cases creates a myriad of potential conflict of interest issues, which include:

> [T]he inability of counsel to conduct independent investigations, the inability of counsel to enter into independent plea negotiations, the inability of counsel to seek immunity for one defendant to testify against another, the inability of counsel to communicate information gained from one client to another because of attorney-client privilege, the inability to waive the right to jury trial for any single defendant, the inability of counsel to present evidence that is exculpatory for one defendant if inculpatory for another, the inability of counsel to argue in the alternative as to the level of culpability of each defendant, the inability of counsel to negotiate after trial on behalf of one defendant against another, and the inability of counsel to argue the defendant's relative blame at sentencing.

*United States v. Coneo–Guerrero*, 148 F.3d 44, 48 (1st Cir.1998). There are inherent difficulties in assessing all possible conflicts of interest in multiple representation scenarios. In *Holloway v. Arkansas*, 435 U.S. 475, 490, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), the Supreme Court recognized that "in a case of joint representation of conflicting interests the evil ... is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process" (emphasis in original). Post-trial representation would necessarily be similarly encumbered. This fact makes it difficult to assess the impact of any conflict of interest, and a knowing and intelligent conflict waiver does not necessarily cure multiple representation issues. There are other interests at stake as well. "Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear to be fair to all who observe them." *Wheat*, 486 U.S. at 160, 108 S.Ct. 1692. Vigorous investigation of potential conflicts of interest early in the proceedings also helps ensure finality of judgments on appeal. *Id.* at 161, 108 S.Ct. 1692. As the Supreme Court noted in *Wheat*:

> [T]rial courts confronted with multiple representations face the prospect of being "whipsawed" by assertions of error no matter which way they rule. If a [trial] court agrees to the multiple representation, and the advocacy of counsel is thereafter impaired as a result, the defendant may well claim that he did not receive effective assistance [of counsel]. ... On the other hand, a [trial] court's refusal to accede to the multiple representation may result in a challenge such as [appellant's] in this case. Nor does a waiver by the defendant necessarily solve the problem, for we note, without passing judgment on, the apparent willingness of Courts of Appeals to entertain ineffective-assistance claims from defendant's who have specifically waived the right to conflict-free counsel.

*Id.* (citations omitted).

Our review of the record of trial in this case clearly supports the military judge's conclusion that a serious potential for conflict existed in Mr. Agha's attempt to represent the appellant *and* his two co-accused. This is particularly true in that each co-accused faced identical charges, and each had made pretrial statements to the Naval Criminal Investigative Service (NCIS) that, at least in part, attempted to shift or deflect blame to another or the others, and, in many respects, provided damaging evidence against their co-actors. *See* Record at 11–13. It was clear that there were significantly varying degrees of culpability in this case, with the appellant "appearing" to be the most culpable. *See* Record at 28, 32, and 39. Also, the trial counsel indicated that the Government intended to try the appellant's two co-actors first, and then grant them testimonial immunity as witnesses in the case against the appellant. The military judge's excellent conflict inquiry and findings of fact (with

*shall include explanation of the implications of the common representation and the advantages and risks involved.* (emphasis added).

The term "covered attorney" also applies to civilian counsel representing individual members of the naval service before courts-martial. *Id.* at p. 2, ¶ 4(b)(2).

which we agree) addressed these and many other apparent conflict issues in great detail. *See* Record at 29–38 and 39–48. Suffice it to say, the military judge correctly determined that there was, at a minimum, *a very serious potential for conflict* in this case, which, in and of itself, served as a proper basis for him to disqualify the appellant's counsel of choice. Record at 48; *Wheat*, 486 U.S. at 164, 108 S.Ct. 1692; *and see United States v. Lanoue*, 137 F.3d at 663; *In re Grand Jury Proceedings*, 859 F.2d 1021, 1023–24 (1st Cir.1988).

■■■ As is almost always the case at the trial court level, judges:

> must pass on the issue whether or not to allow a waiver of a conflict of interest by an [accused] not with the wisdom of hindsight after the trial has taken place, but in the murkier pretrial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials.

*Wheat*, 486 U.S. at 163, 108 S.Ct. 1692. That is why we apply an abuse of discretion standard, allowing trial judges "substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Id.* Conflict of interest was all but a certainty in this case. Accordingly, the military judge properly disqualified Mr. Agha, and properly refused to recognize the appellant's purported waiver of the serious conflict of interest issues.

■■■ Contrary to the assertions of appellate defense counsel, we do not believe that the military judge was under any obligation to afford Mr. Agha the "option" of proceeding with the representation of the appellant and terminating his association with the two co-accused in this case. The military judge does not manage Mr. Agha's law practice, and he need not engage himself in crafting potential remedies for the conflict situations that Mr. Agha's multiple representation of co-actors in companion cases created. The military judge properly performed his duty to identify and evaluate potential conflicts of interest. Once he did so, it was up to Mr. Agha to determine how, if at all, such conflict could be remedied. We further note that, from all appearances, Mr. Agha had formed extensive attorney-client relationships with each co-actor by the time this trial began. *See* Record at 16–17; Appellate Exhibit VI. In this case, those relationships, in and of themselves, created a conflict of interest with the appellant's representation.

A noteworthy postscript to our discussion of this issue is Mr. Agha's own attempt to withdraw from the appellant's representation based upon his conflict of interest. Mr. Agha himself eventually conceded that his representation of the appellant was problematic, as evidenced by the following excerpt from the record:

> CC (Civilian Counsel): For the record, I have talked to PFC Odom about the conflict of interest issue in this case. I also advised him about the nature of the charges against him. . . . I have also asked permission to withdraw. And it is also his intent to submit this issue to the Court.
>
> MJ: Okay. So you have now identified a potential conflict of interest on your part . . . ?
>
> CC: Correct.
>
> MJ: And you would like to withdraw on behalf of the defense—civilian defense team? You would like to proffer a withdraw (sic), but at this time you are prevented from doing so by the wishes of your client, is that correct?
>
> CC: That is correct.

Record at 26–27.[6] Based upon the foregoing, we are completely satisfied that this assignment of error is without merit.

---

**6.** Additionally, the detailed defense counsel, Major [P], opined on the record that he believed Mr. Agha had both an actual and potential conflict of interest in this case, and recommended that Mr.

Agha withdraw from the appellant's representation. Record at 42–43. He indicated that if civilian counsel remained on the case, then he

## Legal and Factual Sufficiency of the Evidence

In his next assignment or error, the appellant challenges both the legal and factual sufficiency of the evidence in regard to his conviction under Article 134, UCMJ, for assault with the intent to commit murder. Appellant's Brief of 9 August 1999 at 3–8. The appellant makes two separate assertions in this regard, contending, first, that the evidence was insufficient to establish that he was the individual who assaulted AN Tarwater, and, second, that even if he was that individual, the evidence is nevertheless insufficient to establish that at the time of the assault he had the specific intent to kill AN Tarwater.

■ The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of this court are themselves convinced of the accused's guilt beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324, 325 (C.M.A.1987). The test for legal sufficiency is whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

### 1. Identity of AN Tarwater's Assailant.

■ We easily dispose of the appellant's first claim. We believe the evidence establishing the appellant as the perpetrator of the assault against AN Tarwater was very strong, and more than sufficient to support his conviction. AN Grimwade's eye-witness identification of the appellant was clear and convincing. Neither AN Grimwade's degree of intoxication, nor his own injuries from having been struck in the face, appeared to inhibit at all his ability to clearly recall and identify his and AN Tarwater's assailant. In fact, he testified that he "absolutely" had a clear recollection of the events of that evening, and had suffered no memory loss. Record at 158. He specifically recalled the appellant's distinctive haircut (shaven head) as well as the black hooded sweatshirt (with white writing on the front) that the appellant wore that night on the bridge. The testimony of AN Grimwade, LCpl Waters, and LCpl Vivian unequivocally placed the appellant on the bridge that night at the time of the assaults. The bridge was sufficiently well lighted, and AN Grimwade had an unobstructed view of the assault upon AN Tarwater from only 5 to 6 feet away. Record at 190, 193. AN Grimwade specifically witnessed the appellant run at AN Tarwater as he struggled to get to his feet, and watched the appellant "body-check" AN Tarwater over the side of the bridge. Record at 170. AN Grimwade described this horrifying scene as his "clearest memory" of the evening, and a scene he would never forget. Record at 173. Within moments of the assaults, Mexican police apprehended the appellant as he ran off the bridge. He had no opportunity to have shed his distinctive clothing, or to have donned it after these incidents. Nobody else in the area at that time matched or approximated the description of the appellant. Within an hour of the assaults, AN Grimwade positively identified the appellant as their assailant. Record at 181–82. Though he did not specifically see the appellant's face while on the bridge that night, he was able to positively identify the appellant based upon his distinctive clothing and hairstyle. *Id.*

LCpl Vivian, the appellant's co-accused and a clearly hostile witness for the Government, specifically witnessed the appellant strike AN Grimwade and then continue up the bridge toward AN Tarwater. He also corroborated the fact that the appellant was wearing a black hooded sweatshirt that night and had closely shaven hair. Though LCpl Vivian denied personally witnessing the appellant push AN Tarwater off the bridge, he did see the appellant and LCpl Waters assaulting Tarwater, and witnessed the appellant subsequently run past him heading off the bridge immediately after AN Tarwater fell. LCpl Vivian also unequivocally established that LCpl Waters was walking off the bridge with him and LaTonya Cantu when

would feel obligated to withdraw himself. *Id.* at 43.

AN Tarwater was pushed, and when the appellant subsequently came running by.

LCpl Waters' testimony also does damage to the appellant's cause in this regard. LCpl Waters, like LCpl Vivian, was a co-accused of the appellant and also a witness hostile to the Government. Nevertheless, LCpl Waters clearly established the appellant as the individual who assaulted AN Grimwade and, with Waters' assistance, AN Tarwater. Consistent with the testimony of LCpl Vivian, LCpl Waters testified that he was walking off the bridge when AN Tarwater was pushed. LCpl Waters also witnessed the appellant running past him off the bridge shortly thereafter, only to be immediately apprehended by Mexican police. LCpl Waters similarly corroborated that the appellant was the only one wearing a black hooded sweatshirt that night, and sporting a shaven head.

Finally, we note the appellant's own evolving and self-serving admissions to NCIS Special Agents investigating these assaults. The appellant initially denied being involved in any assaults at all that night, and claimed that this was all a case of "mistaken identity." Record at 247. Eventually, the appellant admitted being involved in the assaults on both AN Grimwade and AN Tarwater, but denied having pushed AN Tarwater off the bridge. Still later, the appellant acknowledged it was "possible" that he may have "bumped into" AN Tarwater on the bridge, but doubted that actually happened. Record at 254.

Based upon the foregoing, and all the other evidence contained in the record of trial, we are ourselves convinced beyond a reasonable doubt that the appellant is the individual who assaulted AN Grimwade and AN Tarwater, and the person who pushed AN Tarwater off the bridge. We are not troubled in the least by the nature and character of the eyewitness identification in this case. While it may have been more compelling if the Mexican police had taken the time to arrange some sort of formal "line-up" procedure before asking AN Grimwade to identify their suspect in this case, the absence of such, in our opinion, is of no significance in this case. The identification of the appellant was unequivocal, it followed closely on the heels of his immediate apprehension at the scene, and there were no other individuals in the area at the time of the offense (0300 hours) matching the assailant's appearance. *See United States v. Rhodes*, 42 M.J. 287 (1995). There was no question that the appellant was involved in the assaults on the bridge—he ultimately admitted that. The sole issue was whether the appellant was actually the person who pushed AN Tarwater off the bridge. AN Grimwade's direct testimony concerning what he saw on the bridge in this regard was clear, compelling, and unequivocal.

Also, we fail to see how the appellant has any standing whatsoever to complain about the actions (or inaction) of Mexican police officers that occurred in Mexico, and without the involvement of United States law enforcement personnel. Finally, we note the military judge's detailed and extensive instructions concerning AN Grimwade's identification of the appellant. Record at 373–75. We are confident these instructions accurately and adequately addressed the identification issues in this case.

## 2. Evidence of Specific Intent to Kill.

 We first make clear that this offense (assault with intent to commit murder) requires not merely a general intent, but a *specific intent* to kill. *See United States v. Holman*, 3 U.S.C.M.A. 396, 12 C.M.R. 152 (1953).[7] We need not address the appellant's claims concerning sufficiency of the evidence in this regard, because we find error prejudicial to the substantial rights of the appellant in the military judge's improper instructions to the members concerning this offense and its requisite intent.[8] *See* Art. 59(a), UCMJ.

---

7. The elements of assault with intent to commit murder under Article 134, UCMJ, are as follows:
 1) That the accused assaulted AN Tarwater;
 2) That, at the time of the assault, the accused intended to kill AN Tarwater; and,
 3) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces. Manual for Courts-Martial, United States (1995 ed.), Part IV, ¶ 64b.

8. This issue was not raised as an assignment of error.

When instructing the members concerning this offense, the military judge properly listed the elements of assault with intent to commit murder. Record at 361. One of those elements is the requirement that the members be convinced beyond a reasonable doubt that, at the time he committed his assault, the appellant intended to kill AN Tarwater. *See* MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.), Part IV, ¶ 64b. However, in further explaining this offense, the military judge stated that:

Proof that the offense of unpremeditated murder occurred or was committed by an accused is not required.

However, you must be convinced beyond a reasonable doubt [that] at the time of the assault described in the specification the accused had the specific intent to kill *or inflict great bodily harm upon* Airman Tarwater.

Record at 361 (emphasis added). This instruction was clearly erroneous, as intent only to inflict great bodily harm is not sufficient to establish this offense. *See United States v. Roa*, 12 M.J. 210, 212 (C.M.A.1982); *cf. Holman*, 12 C.M.R. at 154. As is clearly stated in the Military Judges' Benchbook:

To convict the accused of [assault with intent to commit murder], proof that the accused only intended to inflict great bodily harm upon the alleged victim is not sufficient. The prosecution must prove beyond a reasonable doubt that the accused specifically intended to kill [the alleged victim].

Military Judges' Benchbook, Dept. of the Army Pamphlet 27–9 at 579 (30 Sept. 1996). Accordingly, because this critical instruction was clearly erroneous, and in our opinion plain error, we must set aside the appellant's conviction on this offense. *United States v. Damatta–Olivera*, 37 M.J. 474 (C.M.A.1993); *United States v. Powell*, 49 M.J. 460 (1998); Art. 59(a), UCMJ.

We may, however, affirm an appropriate lesser-included offense under that originally charged if we are satisfied that the evidence of record establishes each element of that lesser offense by legal and competent evidence beyond a reasonable doubt. Having reviewed the entire record of trial, we are satisfied that the offense of assault in which grievous bodily harm is intentionally inflicted, in violation of Article 128, UCMJ, is established by the evidence of record beyond a reasonable doubt. Accordingly, we shall modify the findings in our decretal paragraph.

### Alleged Prosecutorial Misconduct

The appellant next asserts that the trial counsel in this case committed "prosecutorial misconduct" by issuing a subpoena to Mexican police officials in violation of an applicable treaty between the United States and Mexico providing for cooperation in criminal prosecutions.[9] Appellant's Brief of 9 August 1999 at 8–11. We disagree.

Both the Government and the appellant anticipated the attendance at trial of two Mexican police officers (Mendez and Javier) who were present in the area when AN Tarwater was pushed off of the bridge in Tijuana, and who subsequently participated in the detention of AN Grimwade and the apprehension of the appellant. The Government particularly desired the presence at trial of Officer Mendez, who ostensibly was an eye witness to the appellant pushing AN Tarwater off the bridge. Although somewhat unclear, it appears that the defense team's claimed desire to also have Officer Mendez present was to demonstrate that Mendez' claim to have personally witnessed this incident was not reflected in a subsequently provided translation of a Mexican police report concerning this incident. Ultimately, as a result of clearly unforeseen bureaucratic difficulties in Mexico, neither of these two officers appeared at the appellant's trial. *See generally* Record at 315–326.

Our thorough review of the record indicates absolutely no misconduct on the part of the prosecutor, or any other Government actor, *vis-a-vis* obtaining the presence at trial of these two foreign witnesses. Indeed,

---

9. The Treaty on Cooperation Between the United States of America and the United Mexican States for Mutual Legal Assistance, Dec 9, 1987, U.S.– Mexico, 27 I.L.M. 447 (entered into force May 3, 1991) [hereinafter MLAT]; *see* Appellant's Brief of 9 August 1999 at Appendix A.

the trial counsel and the NCIS agent involved went to extraordinary measures to coordinate with Mexican officials and ensure that these witnesses would be present at trial.[10] Also, they had each been assured on multiple occasions that the witnesses would willingly appear as requested. It was only at the last minute that bureaucratic problems arose in Mexico which, for reasons largely unknown,[11] resulted in the witnesses not attending the proceedings as planned.

We find the appellant's claim of "prosecutorial misconduct" based upon an alleged "treaty violation" in this case unconvincing and disingenuous. First, we note that the treaty involved in this case confers no individual rights to the appellant in regard to obtaining the presence of witnesses from Mexico.[12] *See United States v. Kaufman,* 874 F.2d 242, 243 (5th Cir.1989)(holding that only the offended nation that is party to a treaty may complain of a breach of the treaty). Instead, the aspirational obligations of the treaty are upon the contracting parties, Mexico and the United States, to assist one another in certain law enforcement activities. *Cf. United States v. Alvarez–Machain,* 504 U.S. 655, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992). The performance of any obligation under this treaty falls exclusively within the province of the Executive and Legislative Branches. *Id.; cf. Wilson v. Girard,* 354 U.S. 524, 77 S.Ct. 1409, 1 L.Ed.2d 1544 (1957). Accordingly, the appellant has absolutely no standing to assert a claimed violation of that treaty. *See generally Head Money Cases,* 112 U.S. 580, 598, 5 S.Ct. 247, 28 L.Ed. 798 (1884); *United States v. Morris,* 12 M.J. 262 (C.M.A.1982); *United States v. Whiting,* 12 M.J. 253 (C.M.A.1982); *United States v. Melanson,* 50 M.J. 641, 645 (Army.Ct.Crim.App.1999); *Porter v. Eggers,* 32 M.J. 583 (A.C.M.R.1990). Second, there

is absolutely nothing in the record supporting the appellant's claim that "failure to comply" with the cited treaty had anything at all to do with these witnesses not showing up at trial. Additionally, there is nothing before us which indicates that the cited treaty was the exclusive mechanism by which witness attendance at trial could be sought. The treaty simply afforded the United States an *additional* mechanism for securing the cooperation of Mexican authorities in criminal prosecutions. Third, we find that the Government acted diligently and in complete good faith in trying to obtain the presence of the requested police officers. These actions were completely consistent with the provisions of the treaty in question, and it is clear that unanticipated (and largely unknowable) bureaucratic difficulties within the Mexican government were ultimately what caused these two witnesses not to appear as requested. Finally, we find disingenuous the appellant's claim that he was prejudiced by the failure of these two witnesses to appear when he specifically *opposed* the Government's request for a continuance to obtain their presence. Record at 322–23. This assignment of error is without merit.

### Failure to Grant Motion for Mistrial

The appellant next claims that the military judge abused his discretion in failing to grant his mistrial motion raised after Officer Mendez failed to appear at trial. This argument follows up on the appellant's previous claim of prosecutorial misconduct based upon the trial counsel's failure to secure the presence of Officer Mendez at trial.

In his opening statement to the members, the trial counsel stated that Officer Mendez would testify that he was near the bridge that evening, observed an altercation on the bridge, and saw the appellant push AN Tar-

---

10. Special Agent Nance of NCIS personally coordinated with Mexican officials on numerous occasions concerning this matter, and personally drove to the Mexican border to transport the witnesses to the trial. The trial counsel made multiple telephone calls to a variety of Mexican authorities seeking the attendance at trial of these two witnesses. Additionally, *as specifically requested by Mexican authorities,* the trial counsel issued both subpoenas and letters of invitation seeking their attendance. Record at 317–318.

11. It was represented to the trial counsel and the NCIS Special Agent involved that these officers were still waiting for permission from "higher authorities" to attend the trial. Record at 319.

12. Article 1, Paragraph 5 of the MLAT makes it clear that the treaty is not intended to create rights in private parties either to gather evidence or secure other assistance or to suppress or exclude evidence obtained under the treaty.

water off of it. Record at 147–48. As previously discussed, Officer Mendez never appeared for the trial, and the Government was ultimately forced to conclude their case without his testimony. The appellant now claims that his counsel "relied upon the prosecutor's assertions that Officer Mendez would be present," and that Mendez was critical to the defense case in that he could lay a foundation for admission of Defense Exhibit A (a one page Mexican police report). Appellant's Brief of 9 August 1999 at 10–11. This report, as previously mentioned, was ostensibly significant in its failure to mention that Officer Mendez had personally witnessed the appellant pushing AN Tarwater off the bridge. The appellant also claims that, based on the Government's opening statement, "[t]he members were left with the impression that Mendez would have testified that he saw the appellant push Tarwater, but for a Mexican bureaucratic error." *Id.* at 11. For these reasons, the appellant believes he was entitled to a mistrial. We disagree.

 "The military judge may, as a matter of discretion, declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings." R.C.M. 915(a). "The power to grant a mistrial should be used with great caution, under urgent circumstances, and for plain and obvious reasons." *Id.,* Discussion. It is a well-respected principle of law that recognizes the declaration of a mistrial as a drastic method of remedying error at trial, and one reserved solely for "those situations where the military judge must intervene to prevent a miscarriage of justice." *United States v. Dancy,* 38 M.J. 1, 6 (C.M.A.1993); *United States v. Garces,* 32 M.J. 345, 349 (C.M.A.1991); *United States v. Turner,* 42 M.J. 783, 786 (N.M.Ct.Crim.App.1995). Such a remedy will normally be granted only to prevent manifest injustice. *Id.; United States v. Brooks,* 42 M.J. 484, 487 (1995). Absent a clear abuse of discretion, a military judge's ruling denying a motion for mistrial will not be reversed. *United States v. Rushatz,* 31 M.J. 450, 456 (C.M.A.1990); *United States v. Rosser,* 6 M.J. 267, 270–71; *United*

*States v. Jeanbaptiste,* 5 M.J. 374, 376 (C.M.A.1978).

 "When a military judge is satisfied that the Government has not engaged in intentional misconduct during the trial and concludes that an instruction will cure the potential error, such a procedure is 'preferred.'" *Garces,* 32 M.J. at 349 (quoting *United States v. Evans,* 27 M.J. 34, 39 (C.M.A.1988); *accord United States v. Pastor,* 8 M.J. 280, 284 (C.M.A.1980)). That was exactly the case here. At the time the trial counsel made his opening statement in this case, he honestly believed that Officer Mendez would attend the proceedings and testify as represented. The military judge preliminarily instructed the members that opening arguments were not evidence. Record at 146. When it was subsequently learned that Officers Mendez and Javier would not be coming, the military judge again emphasized to the members that opening statements were not evidence and that the members were to disregard any indication as to what the officers would have testified to:

> Members, if you would recall the instruction please that I gave you prior to the government beginning its case, the opening statement of counsel is not evidence in this case.
>
> Well a portion of the opening statement of counsel eluded (sic) to the expected testimony of Edmundo Javier and Gilberto Mendez who are Mexican state police officials in Tijuana, Mexico. I believe the government eluded (sic) to the fact that they were going to testify in this particular case. The government has elected not to call either of these police officials.
>
> And in regard to any comments made by the government counsel as to what these witnesses would testify to if they were present in court and sworn as witnesses must be totally disregarded by the members.

Record at 325–26. All members acknowledged their understanding of the military judge's instructions and indicated that they could and would follow them. *Id.* at 326. "Even where the possibility of harm to the accused has been acute, both the Supreme Court and [the Court of Appeals for the

Armed Forces] have indulged in a 'crucial assumption' that such instructions will be followed in the absence of evidence to the contrary." *Garces,* 32 M.J. at 349 (quoting *Tennessee v. Street,* 471 U.S. 409, 415, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985); *United States v. Garrett,* 24 M.J. 413 (C.M.A.1987)). Nothing in the record of this general court-martial compels us to question that assumption in this case. We fail to see how the appellant can claim prejudice in this case. The Government played no part whatsoever in the failure of the officers to appear. Also, common experience dictates that, if any prejudice resulted, the Government suffered it when they failed to produce a key witness they had promised during their opening statement.

■ We also find no prejudice to the appellant flowing from the fact that Officer Mendez was not there to lay a foundation for Defense Exhibit A, which ostensibly would have refuted Mendez' testimony—had such been given—that he was a witness to the incident in issue. Absent Officer Mendez, there was simply nothing to refute, and thus no possibility of prejudice.[13] Finally, we note that the appellant never requested the production of Officer Mendez as a witness.

Accordingly, we conclude that the military judge did not abuse his discretion in denying the appellant's motion for a mistrial. This assignment of error is without merit.

### Ineffective Assistance of Counsel

In his next assignment of error, the appellant claims that his detailed defense counsel was ineffective because he "failed to make a motion to suppress a suggestive identification, failed to present exculpatory lab results and witnesses, and presented no evidence whatsoever during the defense case on the merits." Appellant's Brief of 9 August 1999 at 14–17.[14] We disagree.

■ In order to demonstrate ineffective assistance of counsel, an appellant "must surmount a very high hurdle." *United States v. Smith,* 48 M.J. 136, 137 (1998)(quoting *United States v. Moulton,* 47 M.J. 227, 229 (1997)). This is the case because courts will "strongly presume that counsel has provided 'adequate assistance.'" *United States v. Russell,* 48 M.J. 139, 140 (1998)(quoting *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). To demonstrate ineffectiveness, an appellant must first show that his counsel's performance was so deficient that counsel was, in effect, "not functioning as the 'counsel' guaranteed ... by the Sixth Amendment." *Moulton,* 47 M.J. at 229 (quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052). Also, the appellant must show "that the 'deficient performance prejudiced the defense ... [through] errors ... so serious as to deprive the [appellant] of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052).

■ As previously discussed, the identification in this case occurred when AN Grimwade was taken to a Mexican police station by Mexican officials to identify appellant. No other suspects were present. The analysis to Mil.R.Evid. 321, the evidence rule governing eyewitness identification, indicates that exclusion of identification evidence is mandated only when the Constitution requires it or when the evidence "was obtained as a result of an 'unlawful identification process conducted by the United States or other domestic authorities.'" M.C.M., App. 22, Analysis of Mil.R.Evid. 321, A22–31.[15] Obvi-

---

13. Frankly, we fail to see how Defense Exhibit A was relevant at all to this issue. It is a very abbreviated, one-page translation of a statement generically describing the event that occurred. It is not signed or specifically attributed to anyone in particular, and it makes no mention whatsoever as to whether anyone witnessed this event or not.

14. We note that appellate defense counsel erroneously assigns this ineffectiveness to the appellant's "civilian counsel," who were both disqualified prior to the presentation of evidence on the merits of this case. *See* Appellant's Brief of 9

August 1999 at 15. We will address this issue in the context of actions taken by the appellant's detailed defense counsel.

15. "The purpose of a strict rule barring evidence of unnecessarily suggestive confrontations would be to deter the police from using a less reliable procedure where a more reliable one may be available, and would not be based on the assumption that in every instance the admission of evidence of such a confrontation offends due process. Such a rule would have no place in the present case since U.S. officials were not in-

ously, the United States Constitution has no application in Mexico. Thus, it is not at all "clear" that the identification should not have been admitted, or that "the defense counsel was likely to win a motion to sup[p]ress [the identification]." Appellant's Brief of 9 August 1999 at 15. Indeed,

> [t]he mere fact that during an investigation a foreign functionary did not observe all of the rights generally afforded an accused under the United States Constitution would not, standing alone, render evidence obtained thereby inadmissible before a subsequent court-martial.

*United States v. Waldrop*, 41 C.M.R. 907, 909, 1969 WL 6445 (A.F.C.M.R.1969) (citations omitted). *See United States v. Toscanino*, 500 F.2d 267, 280 n. 9 (2nd Cir.1974) (stating that "[t]he Constitution . . . does not govern the independent conduct of foreign officials in their own country.")(citing *Birdsell v. United States*, 346 F.2d 775, 782 (5th Cir.1965)); *United States v. Benedict*, 647 F.2d 928, 930 (9th Cir.1981) (noting that the Fourth Amendment and the exclusionary rule of evidence do not apply to the acts of foreign officials on foreign soil). Moreover, even if the Constitution did apply in this case, the appellant would still not be entitled to relief:

> [I]t is not enough merely to establish that a showup is suggestive. Due process is not violated unless there is an "unnecessarily suggestive" pretrial identification that leads to a substantial likelihood of mistaken identify at the time of trial. An immediate identification while the witness' memory is still fresh and when there are no grounds for holding a suspect has been held not to be unnecessar[ily suggestive] under the Due Process Clause of the Fifth Amendment. It is important to have a one-on-one confrontation take place immediately after a crime while memories are fresh so innocent individuals may be released. An immediate confrontation permits investigative activities to be refocused if there is no identification.

volved." *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

*Rhodes*, 42 M.J. at 290–91 (citations omitted). For the reasons we have previously stated, we believe the identification of the appellant was clearly admissible, and that a motion to suppress the identification of no merit.

 It is also clear that the defense counsel was not ineffective in regard to failing to submit various laboratory results in this case. On cross-examination of NCIS Special Agent Nance, the appellant's counsel established that the laboratory results in this case had been "negative" for the presence of blood and/or bodily fluids on the appellant's and LCpl Water's shoes. Record at 263.[16] Therefore, counsel had no need to further submit the actual lab results to establish this very same fact. We will not require trial defense counsel to submit cumulative or redundant evidence.

 Finally, as to counsel's failure to call Ms. Cantu, we note that "[a]ppellate courts will [normally] give due deference to the strategic and tactical decisions made at trial by defense counsel." *United States v. Brewer*, 51 M.J. 542, 543 (Army Ct.Crim.App. 1999) (citing *United States v. Morgan*, 37 M.J. 407, 410 (C.M.A.1993)). One completely valid reason not to have called Ms. Cantu as a witness could be her apparent lack of credibility. The appellant points to Ms. Cantu's Article 32, UCMJ, testimony in support of his claim. Appellant's Brief of 9 August 1999 at 17. However, this same testimony revealed that Ms. Cantu, in her original statement to NCIS, had stated that the appellant **could have** pushed AN Tarwater off the bridge. Certainly, defense counsel might have good tactical reasons for not calling a witness who had made a statement soon after the incident in question that admitted that his client *could have* committed the offense. Additionally, questioning of Ms. Cantu by Government counsel during the Article 32, UCMJ, investigation revealed significant inconsistencies between her testimony and her original statements to NCIS. It also revealed that Ms. Cantu was the appellant's friend, and had spoken to him several times since the assault. Thus, there were valid

16. The appellant's counsel also cited these negative lab results to the members in his closing argument. Record at 348.

credibility issues at stake, which supported the defense counsel's tactical decision not to call her as a witness. Accordingly, appellant has failed to demonstrate that his counsel was ineffective.

## Sentence Appropriateness

 We consider the appellant's last assignment of error, alleging that his sentence is inappropriately severe, in the context of the sentence as we have reassessed it below.[17] We have thoughtfully pondered the appellant's assertion that his co-actors received far more lenient treatment than he did, thereby mandating a sentence reduction. While these cases are arguably "closely related," we find good and cogent reasons for the disparity between the appellant's sentence and those received by his two co-actors. *See United States v. Kelly*, 40 M.J. 558 (N.M.C.M.R.1994). First, the appellant pled not guilty while his co-actors admitted their guilt and, although hostile, agreed to cooperate with the Government in the prosecution of the appellant. Second, one of the appellant's co-actors, LCpl Vivian, was not tried at all but instead was administratively separated from the Marine Corps. *See United States v. Noble*, 50 M.J. 293, 294–295 (1999)(holding that where there is no court-martial record of trial that can be compared, the issue of sentence uniformity is not presented). Also, the appellant's degree of involvement and culpability in these offenses was far greater than that of his co-actors. Finally, the appellant was the only one involved in the most heinous crime committed that morning, intentionally pushing AN Tarwater off of the bridge. These facts provide us with an extremely rational explanation for the differences between or among these companion cases. *See United States v. Fee*, 50 M.J. 290, 291–92 (1999); *United States v. Lacy*, 50 M.J. 286, 288–89 (1999).

We have evaluated this sentence giving "individualized consideration" based upon "the nature and seriousness of the offense and the character of the offender." *United States v. Rojas*, 15 M.J. 902, 919 (N.M.C.M.R.1983) (citing *United States v. Snelling*, 14 M.J. 267 (C.M.A.1982), *aff'd*, 20 M.J. 330 (C.M.A.1985)); *see also United States v. Varacalle*, 4 M.J. 181, 183 (C.M.A. 1978). We believe the sentence as reassessed below is appropriate in every respect.

## Conclusion

We set aside the finding of guilty to assault with intent to commit murder in violation of Article 134, UCMJ. We approve a finding of guilty to the lesser-included offense of assault in which grievous bodily harm is intentionally inflicted in violation of Article 128, UCMJ, as follows:

> In that Private First Class Samuel R. Odom, U.S. Marine Corps, on active duty, did, at or near Tijuana, Baja California, Mexico, on or about 15 March 1997, commit an aggravated assault upon Airman Travis A. Tarwater, U.S. Navy, by punching and kicking him, and pushing him off of a bridge, and did thereby intentionally inflict grievous bodily harm upon him, to

17. In *United States v. Curtis*, 52 M.J. 166, 169 (1999) and *United States v. Taylor*, 47 M.J. 322, 324 (1997), the Court of Appeals for the Armed Forces (CAAF) held that when error prejudicial to the appellant's substantial rights occurs at trial, the service Courts of Criminal Appeals may reassess the sentence, vice ordering a sentencing rehearing, when they are convinced that the appellant's sentence "would have been at least of a certain magnitude." *Id.* (*quoting Sales*, 22 M.J. at 307). In *Sales*, CAAF made it clear that if the service Courts of Criminal Appeals can determine that the sentence "would have been at least of a certain magnitude," then it "need not order a rehearing on sentence, but instead may itself reassess the sentence." *Sales* at 307; *see also United States v. Davis*, 48 M.J. 494, 495 (1998). In this case, we are confident that we may properly reassess the appellant's sentence, and that a rehearing on sentence is not required.

We recognize that our task in reassessing the sentence in this case differs significantly from that which we normally perform under our Article 66, UCMJ, mandate in determining sentence appropriateness. When prejudicial error has occurred at trial, as was the case here, we must assure that the sentence is appropriate in relation to the affirmed findings of guilt, and that the sentence is no greater than that which would have been imposed if the prejudicial error had not occurred. Only then can we reconcile the requirements of Article 59(a), UCMJ, with the Code provisions requiring that findings and sentence be rendered by the court-martial, rather than by this court. *See* Arts. 51 and 52, UCMJ; *United States v. Suzuki*, 20 M.J. 248, 249 (C.M.A. 1985). Thus, "a reassessed sentence must be purged of prejudicial error *and also* must be 'appropriate' for the offense[s] involved." *Sales*, 22 M.J. at 308.

wit: a skull fracture resulting in permanent brain damage.

The remaining findings as approved on review below, are affirmed. We have reassessed the sentence in accordance with the principles announced in *United States v. Cook,* 48 M.J. 434, 437–38 (C.M.A.1998), *United States v. Peoples,* 29 M.J. 426, 427–29 (C.M.A.1990), and *United States v. Sales,* 22 M.J. 305, 307–08 (C.M.A.1986). Having done so, we approve so much of the sentence as provides for confinement for 8 years, total forfeitures, reduction to pay grade E–1, and a dishonorable discharge. A new court-martial order reflecting the modified findings and sentence in this case shall be issued.

Senior Judges TROIDL and DORMAN concur.