# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**J.A. FISCHER, D.C. KING, T.H. CAMPBELL**
**Appellate Military Judges**

**UNITED STATES OF AMERICA**

v.

**DAVID W. WELCH**
**CRYPTOLOGIC TECHNICIAN INTERPRETIVE SECOND CLASS**
**(E-5), U.S. NAVY**

**NMCCA 201500184**
**GENERAL COURT-MARTIAL**

**Sentence Adjudged:** 9 March 2015.
**Military Judge:** CDR Robert P. Monahan, Jr., JAGC, USN.
**Convening Authority:** Commandant, Naval District Washington, Washington Navy Yard, Washington, DC.
**Staff Judge Advocate's Recommendation:** LCDR J.D. Pilling, JAGC, USN.
**For Appellant:** LT Jacqueline Leonard, JAGC, USN.
**For Appellee:** Maj Suzanne Dempsey, USMC; LT Taurean Brown, JAGC, USN.

**21 April 2016**

---------------------------------------------------
## OPINION OF THE COURT
---------------------------------------------------

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

CAMPBELL, Judge:

General court-martial officer and enlisted members convicted the appellant of three abusive sexual contact specifications—violations of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920.[1]  They sentenced the appellant to one year of confinement and a dishonorable discharge.  The convening authority approved the sentence as adjudged.

---

[1] The members found the appellant not guilty of four other abusive sexual contact specifications and two sexual assault specifications, also alleged as violations of Article 120, UCMJ.

In two assignments of error (AOEs), the appellant contends that the evidence is legally and factually insufficient to support one of the abusive sexual contact convictions and that his sentence is inappropriately severe. Having carefully considered the record of trial and parties' submissions, we find merit in the first AOE. Consequently, we modify the findings and reassess the sentence, as reflected in the decretal paragraph. With that corrective action, we affirm the remaining findings, and conclude that no error materially prejudicial to the appellant's substantial rights remains. Arts. 59(a) and 66(c), UCMJ.

**Background**

The appellant's abusive sexual contact convictions stem from three incidents with the same victim, Cryptologic Technician Interpretive Third Class (CTI3) J.W. The two men met at boot camp in July 2010. They later became roommates and close friends during their lengthy, follow-on assignment at the Defense Language Institute (DLI). There they met a fellow Russian linguist, CTI3 A.A., and together became the "Three Amigos."[2] The trio often socialized together outside of work, but there were certainly times when CTI3 A.A., a female Sailor, did not accompany the other two.

For example, in April 2011, the roommates went alone on a camping trip. They drank beer by a campfire and talked for hours before settling into sleeping bags under the stars. Sometime during the night, CTI3 J.W. awoke to find his penis being grasped by the appellant, who was stretching from his own sleeping bag to reach into CTI3 J.W.'s sleeping bag, coveralls, trousers and underwear.[3] Despite the appellant's attempt to quickly dismiss the incident, CTI3 J.W. insisted on an explanation. During a nearly two-hour conversation, the appellant admitted that he was attracted to men, had felt the attraction for as long as he could remember, and would hate himself if anyone else knew. CTI3 J.W. explained that he was not gay, but he was willing to help the appellant work through these personal concerns. They remained friends and roommates, and the appellant frequently discussed his sexual identity issues with CTI3 J.W.

In late 2011, the appellant, CTI3 J.W. and CTI3 A.A. all transferred to Fort Meade, Maryland. While CTI3 J.W. and the appellant were not roommates there, all three friends continued their close relationships at their new command. CTI3 J.W. and CTI3 A.A. also continued a courtship which began at DLI, and they ultimately married in April 2012. But the marriage was quickly strained. By the following year, they separated in anticipation of their eventual divorce in 2014. During the marriage, the appellant and CTI3 J.W. continued to provide each other friendship and support. As CTI3 J.W. became depressed by the failure of his marriage, he spent more time with the appellant, who then lived off-base in Baltimore, Maryland.

One night in May 2013, they drank at several Baltimore bars, discussing CTI3's probable divorce and the appellant's relationships with men. By the time they returned to the appellant's apartment, CTI3 J.W. was intoxicated. He vomited in the bathroom and then fell asleep on the

---

[2] Record at 448.

[3] Specification 2 of the appellant's sole charge alleged that the appellant grabbed CTI3 J.W.'s penis with his hand when CTI3 J.W. was substantially incapable of appraising the nature of the sexual contact. Unlike the other conviction offenses, it involves the version of Article 120 in effect from 1 October 2007 through 27 June 2012.

couch, accompanied by a trash can and a blanket. Although nothing sexual had occurred between them during the two years since the camping incident, CTI3 J.W. awoke to the appellant standing "not six inches away" from his face; the appellant held "his [own] penis in his hands and his pants were pulled down to his knees."[4] The appellant then "leaned forward and touched the tip of his penis to the outside of [CTI3 J.W.'s] lips.[5] CTI3 J.W. made a noise "to let [the appellant] know that [he was] awake,"[6] and rolled over. Still not feeling well, and believing that the appellant was "not going to try anything after this point," CTI3 J.W. just went back to sleep on the couch.[7] He testified about later discussing that night with the appellant and how it affected the two of them:

> I said, "Hey, you know, the other night I remember waking up and I see you standing there with your penis out in front of me." And he said, "I'm sorry. I don't remember any of that. I'm really sorry. I don't know what happened. "[8]

> . . . .

> After that time . . . . It was very uncomfortable being around him. I wanted to be careful not to give him the opportunity to, you know, do that again. And I wasn't too comfortable hanging out with him one-on-one. I started hanging out with him more with friends. He didn't appreciate that too much. It hurt him a little bit that I didn't want to hang out one-on-one anymore.[9]

Nonetheless, after beginning his marital separation in August 2013, CTI3 J.W. again started talking more to the appellant, who provided updates on how and what CTI3 A.A. was doing without him. A few months later, CTI3 J.W.'s roommates left for Christmas, but he remained because of watch duties. Alone and "very depressed," he accepted the appellant's invitation to go to the appellant's parents' house on Christmas Day.[10] Since it was easier for the appellant to drive directly to the house rather than first stopping by CTI3 J.W.'s apartment, CTI3 J.W. agreed to go to Baltimore on 24 December 2013. He and the appellant had three or four beers at a bar, and then went to the appellant's apartment where they watched television on the appellant's couch. After dozing off, CTI3 J.W. awoke to "a brushing sensation on the outside of

---

[4] Record at 480.

[5] *Id.* Specification 5 alleged that the appellant placed his penis on CTI3 J.W.'s lips when the appellant knew or reasonably should have known that CTI3 J.W. was asleep, unconscious, or otherwise unaware the sexual contact was occurring. As an alternate theory, Specification 4, of which the members found the appellant not guilty, alleged that CTI3 J.W. was incapable of consenting to this sexual act due to his impairment by alcohol, a condition that was known or reasonably should have been known by the appellant.

[6] Record at 481.

[7] *Id.*

[8] *Id.* at 484.

[9] *Id.* at 485.

[10] *Id.* at 486.

3

[his] jeans over [his] crotch."[11]  Finding the appellant standing beside him and touching his crotch, CTI3 J.W. quickly stood and angrily confronted him.[12]

**Analysis**

**I.** *Legal and Factual Sufficiency*

The appellant avers that no reasonable factfinder could have found CTI3 J.W. "asleep, unconscious, or otherwise unaware of the sexual contact that occurred between him and [the appellant] in May 2013."[13]  Contending that the conviction is legally and factually sufficient, the Government insists that credible evidence proved the appellant "began and completed the sexually abusive act while he believed CTI3 J[.]W[.] was asleep."[14]

We review every case *de novo* for legal and factual sufficiency.  Art. 66(c), UCMJ, *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).  The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, any reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Day*, 66 M.J. 172, 173-74 (C.A.A.F. 2008) (citing *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987)).  In applying this test, "we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is whether "after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt." *United States v. Rankin*, 63 M.J. 552, 557 (N.M.Ct.Crim.App. 2006) (citing *Turner*, 25 M.J. at 325 and Art. 66(c), UCMJ), *aff'd*, 64 M.J. 348 (C.A.A.F. 2007).  In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

A conviction for this abusive sexual contact offense requires proof beyond a reasonable doubt for its two elements:  (1) the appellant committed sexual contact upon CTI3 J.W. by placing his penis on CTI3 J.W.'s lips; and (2) the appellant knew or reasonably should have known that CTI3 J.W. was asleep, unconscious, or otherwise unaware that the sexual contact was occurring.[15]  The trial testimony indicated that the appellant was standing by the couch holding

---

[11] *Id.* at 489.

[12] Specification 8 alleged that the appellant touched CTI3 J.W.'s penis with his hand when he knew or reasonably should have known that CTI3 J.W. was asleep, unconscious, or otherwise unaware the sexual contact was occurring.

[13] Appellant's Brief of 12 Nov 2015 at 7.

[14] Government's Brief of 13 Jan 2016 at 10.

[15] MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), Part IV, ¶ 45.a(d).

his penis when CTI3 J.W. awoke; he put his penis on the victim's lips after CTI3 J.W. "was aware of what was happening;"[16] and he had a discussion at least one day, if not more, afterwards, in which CTI3 J.W. was able to recall and describe the encounter to him.

Considering all of the evidence presented in this case, we agree with the appellant that the evidence is legally and factually insufficient regarding the second element. The victim simply was not asleep, unconscious or otherwise unaware at the time of the alleged sexual contact. To the contrary, based upon his level of awareness, CTI3 J.W. was able to provide the only evidence of the incident. There was no other percipient witness or physical evidence, and the appellant never confessed to this specific encounter during discussions with any of the trial witnesses or other law enforcement officials. CTI3 J.W.'s testimony during cross-examination confirmed that he was awake and aware of the sexual contact:

Q: So you testified that at some point you woke up later that evening, correct?
A: Yes.

Q: And [the appellant] was standing in front of you?
A: Yes.

Q: With his penis exposed?
A: Yes.

Q: And at that point, you were awake?
A: Yes.
. . . .
Q: Not intoxicated?
A: -- I was aware of what was happening.[17]

The Government focuses on the appellant's belief that CTI3 J.W. was asleep before he initiated sexual contact in this encounter.[18] That argument is misplaced as an effort to salvage this conviction in light of the victim's admitted awareness of what was occurring before, during and after the sexual contact—and his apparent wherewithal to successfully thwart the appellant's further actions by making noises and rolling over. But the Government's argument effectively demonstrates, and we are convinced beyond a reasonable doubt, that the appellant placed his penis on CTI3 J.W.'s lips with the intent of doing so while CTI3 J.W. was asleep, unconscious or otherwise unaware.

---

[16] Record at 543.

[17] *Id.*

[18] "[The a]ppellant, who was sitting near him on the couch and brought CTI3 JW a blanket, saw him go from violent vomiting to rest. . . . The instantaneous progression of the act and the fact that Appellant was already positioned with his penis in CTI3 JW's face when he opened his eyes—as well as the fact that Appellant did not 'shake CTI3 awake' to inquire if he would consent to the touching—all denied CTI3 J.W. the opportunity to refuse the contact. Once he gained his full senses, CTI3 JW groaned to indicate that he was awake, and turned over to avoid the contact. It was only at this point—where it was clear that his victim was awake—that [the a]ppellant stopped his pursuit." Government Brief at 12-13.

To constitute the lesser included offense of an attempted abusive sexual contact of this variety, Article 80, UCMJ, 10 U.S.C. § 880, requires an act, done with the specific intent to commit an [abusive sexual contact while the victim was asleep, unconscious, or otherwise unaware that the sexual contact was occurring], amounting to more than mere preparation and tending, even though failing, to effect its commission. The specific intent to commit the offense must be accompanied by an overt act which directly tends to accomplish the unlawful purpose. The overt act required goes beyond preparatory steps and is a direct movement toward the commission of the offense. MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), Part. IV, ¶¶ 4a(a) and c(1)-(2).

The appellant's placing his penis on CTI3 J.W.'s lips was an overt act that constituted direct movement toward the commission of an abusive sexual contact while CTI3 J.W. was asleep. But for CTI3 J.W. waking when the appellant was positioned inches away, before the touching, the appellant would have engaged in this act while CTI3 J.W. was asleep, unconscious, or otherwise unaware. Consequently, we affirm the conviction to the lesser included offense of attempted abusive sexual contact. *See United States v. King*, 71 M.J. 50 (C.A.A.F. 2012); *United States v. Odom*, 53 M.J. 526, 536 (N.M.Ct.Crim.App. 2000).

## II. *Sentence Reassessment*

In his second AOE, the appellant asserts that "the wrongful conviction [for the May 2013 abusive sexual contact] likely had a significant impact on the members' decision to award a dishonorable discharge," and requests that we "grant sentencing relief by upgrading the punitive discharge."[19] Because of our action on the findings, this AOE is moot, and we reassess the sentence in accordance with the principles set forth in *United States v. Winckelmann,* 73 M.J. 11, 15-16 (C.A.A.F. 2013, *United States v. Moffeit*, 63 M.J. 40 (C.A.A.F. 2006), *United States v. Cook*, 48 M.J. 434, 438 (C.A.A.F. 1998), and *United States v. Sales*, 22 M.J. 305, 307-09 (C.M.A. 1986). We are able to reliably determine that, absent the error, the sentence would have been at least of a certain magnitude. *United States v. Harris*, 53 M.J. 86, 88 (C.A.A.F. 2000).

An attempted abusive sexual contact conviction does not change the sentencing landscape. The appellant's maximum punishment, and the number and factual nature of the criminal acts the panel considered when determining a proper sentence remain the same. These offenses are of the type that we have experience and familiarity with as appellate judges, allowing us to reliably determine what sentence would have been imposed at trial by the sentencing authority. The members originally adjudged the sentence based upon the circumstances of the appellant's actions, not the proper legal label applicable to one of the three incidents with CTI3 J.W. Therefore, we conclude that we can reassess the sentence.

Had there been convictions for only two abusive sexual contacts and an attempted abusive sexual contact, we are confident that the members would have imposed the same one year of confinement and dishonorable discharge as imposed at trial, and that the convening authority would have approved the same.

---

[19] Appellant's Brief at 15-16.

**Conclusion**

The guilty finding for Specification 5 of the sole charge, abusive sexual contact, is set aside and we affirm instead a finding of guilty of its lesser included offense under Article 80, UCMJ, attempted abusive sexual contact. The remaining findings of guilty are also affirmed. We reassess the sentence and affirm the same sentence as previously approved by the convening authority.

Senior Judge FISCHER and Senior Judge KING concur.

For the Court



R.H. TROIDL
Clerk of Court