UNITED STATES, Appellee,

v.

Private E1 David M. MELANSON, United States Army, Appellant.

ARMY 9801266.

U.S. Army Court of Criminal Appeals.

21 April 1999.

For Appellant: Captain John C. Einstman, JA (argued); Lieutenant Colonel Adele H. Odegard, JA; Major Leslie A. Nepper, JA (on brief); Colonel John T. Phelps II, JA.

For Appellee: Captain John W. O'Brien, JA (argued); Colonel Russell S. Estey, JA; Major Michael J. Klausner, JA (on brief); Lieutenant Colonel Eugene R. Milhizer, JA.

Before JOHNSTON, Senior Judge, SQUIRES, and ECKER, Appellate Military Judges.

## OPINION OF THE COURT

SQUIRES, Judge:

Pursuant to his pleas, Private (PVT) Melanson was convicted on 10 September 1998 of disobeying a lawful order, disobeying a superior commissioned officer, wrongfully using methamphetamines, committing an aggravated assault, and breaking restriction, in violation of Articles 90, 92, 112a, 128, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 890, 892, 912a, 928, and 934 [hereinafter UCMJ]. Appellant's approved sentence includes a bad-conduct discharge, confinement for thirty months, forfeiture of all pay and allowances, and notwithstanding the fact he was already a Private E1, reduction to Private E1. The convening authority credited PVT Melanson with fifty-seven days of credit against the sentence to confinement.

## PROCEDURAL HISTORY

Twelve days after contesting the Army's in personam jurisdiction to court-martial him, and then pleading guilty, PVT Melanson filed a Petition for Extraordinary Relief in the Nature of a Writ of Habeas Corpus with this Court. *Melanson v. Wright,* ARMY MISC 9801349 (Army Ct.Crim.App. 6 Nov. 1998)(unpub). After receiving briefs from both government and defense counsel and hearing oral argument, we determined that the issue of in personam jurisdiction should be litigated in the normal appellate process and denied the writ. *Id.* at 2, 6. Private Melanson's writ appeal to the Court of Appeals for the Armed Forces was denied on 2 December 1998. Appellant's petition for reconsideration was denied by our superior court on 14 January 1999.

The case is now before us for review pursuant to Article 66(c), UCMJ. In a lone assignment of error, appellant renews his argument that the Army lacked in personam jurisdiction over him because he had received his discharge certificate as well as an accounting of his final pay, and had outprocessed from his unit. We find the military judge's legal conclusion that the United States retained court-martial jurisdiction over appellant to be correct and affirm the findings and sentence.

## FACTS

On 10 May 1998, Staff Sergeant (SSG) Dunn was assaulted outside of the Nashville Club in Vilseck, Germany. His head injuries required hospitalization. Staff Sergeant Dunn was unable to identify his assailants.

During the next week, German Polizei (police), and agents from the local Criminal Investigation Command and Military Police Investigations (MPI) attempted to identify the attackers. As investigators found eyewitnesses to the 10 May fracas, some suspects were "cleared" and other soldiers (to include appellant) became suspects in the investigation of the assault on SSG Dunn.

On 19 May, MPI Investigator (INV) Dillard met with Captain (CPT) Finn, the company commander of appellant and several soldiers who were present at the Nashville Club when SSG Dunn was assaulted. Cap-

tain Finn believed that the description of one of the assailants fit PVT Melanson. Investigator Dillard then photographed appellant (and other soldiers) to aid the eyewitnesses in their identification process.

While police agents were busily attempting to identify SSG Dunn's attackers, appellant was outprocessing from his unit pursuant to his approved separation under Army Reg. 635–200, Enlisted Personnel, para. 14–12c(2)(17 Oct. 1990)[hereinafter AR 635–200] for wrongful drug use. To comply with U.S. Army Europe's implementation of transition processing,[1] PVT Melanson completed his preseparation administrative outprocessing on 19 May. Pursuant to his separation orders, he was to fly from Germany to his Massachusetts home of record at government expense on 20 May. These orders reflected a discharge date of 20 May. Captain Finn had received both command and legal advice to let PVT Melanson depart unless an eyewitness could positively identify appellant as one of SSG Dunn's attackers.

At 0008, 20 May 1998, PVT Melanson signed out of his Vilseck unit and was escorted to the Nuernberg airport. From there he flew to Frankfurt, Germany, where he boarded an airplane bound for Washington, D.C. While PVT Melanson was enroute to Frankfurt, INV Dillard was conducting a photographic lineup with two eyewitnesses that he had been unable to find the previous day. Both witnesses identified PVT Melanson as one of SSG Dunn's attackers.

Captain Finn directed INV Dillard to stop appellant from boarding his flight in Frankfurt. In response to this command directive, the German polizei took PVT Melanson into custody. Later that day, the command revoked appellant's AR 635–200 administrative separation. On 24 June, CPT Finn preferred court-martial charges against PVT Melanson for the aggravated assault of SSG Dunn and other offenses.

## IN PERSONAM JURISDICTION

■ The question of in personam jurisdiction in appellant's case was extensively briefed by the parties and addressed through the taking of testimony and evidence at trial. The military judge correctly determined that under military law, a discharge is effective upon receipt of a valid discharge certificate, a final accounting of pay, and completion of the clearing process. *See United States v. King,* 42 M.J. 79 (1995). Applying the law to the facts developed at trial, she found that while appellant had received copy 4 of his DD 214, that certificate of release from active duty was neither a discharge certificate nor the equivalent thereof. The military judge also found that PVT Melanson had never received his final pay. She did find that appellant had completed the clearing process.

■ We review a military judge's legal conclusions under a *de novo* standard. *See United States v. Miller,* 48 M.J. 49, 54 (1998)(citing *United States v. Davis,* 36 M.J. 337, 340 (C.M.A.1993)); Steven Alan Childress and Martha S. Davis, *Federal Standards of Review* § 2.13, at 2–92 (2d ed.1992). Insofar as her legal conclusion that in personam jurisdiction over PVT Melanson was never lost or extinguished is concerned, she appropriately applied the law.

■ Court-martial jurisdiction generally is lost when a soldier receives proper notice that his military status has terminated. *See* 10 U.S.C. §§ 1168, 1169; UCMJ art. 2(a)(1); *United States ex rel. Toth v. Quarles,* 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955); *United States v. Batchelder,* 41 M.J. 337 (1994); *United States v. Garvin,* 26 M.J. 194, 195–96 (C.M.A.1988)(citing *United States v. Griffin,* 13 U.S.C.M.A. 213, 215–16, 32 C.M.R. 213, 215–16, 1962 WL 4480 (1962)); *United States v. Howard,* 20 M.J. 353 (C.M.A.1985); *United States v. Scott,* 11 U.S.C.M.A. 646, 29 C.M.R. 462, 1960 WL 4532 (1960); The Judge Advocates General,

---

1. In June 1995, U.S. Army Europe (USAREUR) assumed the mission (previously performed at Fort Dix, New Jersey, and Fort Jackson, South Carolina) for the "transition processing" of most soldiers stationed in Europe. (USAREUR Transition Center Implementing Instructions Message (Implementing Instructions); Government Appellate Ex. IV). As a result, the routine administrative functions associated with separating a soldier from the Army, e.g., medical, personnel, financial, transportation of household goods and family members, are to be performed at transition centers in Germany.

Annotation, *Discharge*, Digest of Opinions of the Judge Advocates General of the Army ¶¶ VIIIA–XXB, at 443–61 (1912) (citations omitted); *see also* Francis A. Gilligan and Fredric I. Lederer, *Court–Martial Procedure* § 2–22.10(b)(1), at 53 (1991)(citing *Howard*, 20 M.J. 353).

■ Both statute [2] and case law give us the components of this required notice: "(1) 'delivery of a valid discharge certificate'; (2) 'a final accounting of pay'; and (3) undergoing 'the "clearing" process required under appropriate service regulations to separate' a servicemember 'from military service.'" *United States v. King*, 42 M.J. 79, 80 (1995)(quoting *United States v. King*, 27 M.J. 327, 329 (C.M.A.1989)).

■ We have no quarrel with the military judge's finding, based on the evidence before her, that PVT Melanson "had completed the clearing process," as far as that relates to administrative outprocessing of his unit. However, we conclude that appellant (who was being discharged before his term of service expired) never completed the process of separating from the Army before his apprehension in Frankfurt, Germany. Since he never had his military status severed, PVT Melanson remained a soldier, subject to UCMJ jurisdiction *and* the protections his status afforded him in a foreign country.

For soldiers stationed overseas, the process of separating from the Army includes compliance with all treaty obligations. Article III of the Agreement between the Parties to the North Atlantic Treaty regarding the Status of their Forces [3] read in conjunction with its Supplementary Agreement [4] with respect to foreign forces stationed in Germany, clearly places on the United States, as the sending state, the obligation to repatriate those members of the force that it introduces into Germany (receiving state). *See Appendix* for the text of Article III. This duty of repatriation is a treaty obligation. We have found a paucity of law which applies these treaty requirements to the body of law encompassing court-martial in personam jurisdiction. As a treaty, the NATO SOFA is an integral part of our jurisprudence and must be given full effect. *See Reid v. Covert*, 354 U.S. 1, 4, 18 & n. 34 (1957)(plurality); *Head Money Cases*, 112 U.S. 580, 598, 5 S.Ct. 247, 28 L.Ed. 798 (1884); *Holmes v. Laird*, 459 F.2d 1211, 1222 (D.C.Cir.1972)(military authorities have the responsibility for enforcing some international agreements).

The NATO SOFA imposes on the United States government an obligation to remove those members of the force from foreign soil that it has placed there pursuant to the mutual protection purposes of the treaty. The United States Army served as the agent of the United States of America to execute the treaty's requirement to remove PVT Melanson from Germany and return him to the United States. Until this was accomplished, PVT Melanson remained a member of the United States Army, as demonstrated by the fact that he still carried a military identification card and documentation evidencing military service. Without such documentation Private Melanson could have been denied entry into the United States by Immigration and Naturalization Service officials at his designated port of entry (Washington, D.C.) because, as the record shows, he had no passport.

We have considered appellant's argument that Articles III and VII of the NATO SOFA

---

**2.** 10 U.S.C. § 1168. Discharge or release from active duty: limitations

(a) A member of an armed force may not be discharged or released from active duty until his discharge certificate or certificate of release from active duty, respectively, and his final pay or substantial part of that pay, are ready for delivery to him or his next of kin or legal representative.

10 U.S.C. § 1169. Regular enlisted members: limitations on discharge

No regular enlisted member of an armed force may be discharged before his term of service expires, except—

(1) as prescribed by the Secretary concerned;

(2) by sentence of a general or special court-martial; or

(3) as otherwise provided by law.

**3.** June 19, 1951–Oct. 27, 1953, NATO, T.I.A.S. No. 2846 [hereinafter NATO SOFA].

**4.** Agreement to Supplement NATO SOFA with respect to Foreign Forces stationed in the Federal Republic of Germany, Aug. 3, 1959–June 1, 1963, NATO, T.I.A.S. No. 5351 [hereinafter Supplementary Agreement].

operate independently in this case. Appellate defense counsel contend that PVT Melanson was discharged at 0008 on 20 May when he signed out of his unit. While agreeing the United States had an obligation to repatriate him under Article III of the NATO SOFA, defense appellate counsel contends that the United States Army had no jurisdiction to try civilian Melanson under Article VII of the NATO SOFA. We reject this approach for two reasons. First, Article VII of the NATO SOFA confers no individual rights on PVT Melanson (unless he was to be tried by the German government) and thus he has no standing to complain at a U.S. Army conducted court-martial. *Cf. Porter v. Eggers*, 32 M.J. 583 (A.C.M.R.1990). Secondly, Article VII of the NATO SOFA does not prohibit the exercise of jurisdiction by a sovereign—it simply sets out which states have the right to exercise criminal jurisdiction. *See United States v. Bowie*, 34 C.M.R. 808, 813, 1964 WL 5110 (A.F.B.R.1964). We have found nothing in the record of trial or defense pleadings to show that the sovereign state of Germany has protested to the sovereign United States of America and that the Army had no jurisdiction to try PVT Melanson. *See Head Money Cases*, 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798.

■ We are convinced that appellant's outprocessing from the Army was incomplete, and thus his status as a soldier was never terminated prior to his apprehension at the Frankfurt airport. Additionally, we have conducted a de novo review of the trial judge's findings and legal conclusions regarding appellant's never receiving a discharge certificate, or equivalent paperwork, that conferred civilian status on appellant prior to his apprehension, and agree with her in law and fact.[5] Having satisfied ourselves that appellant's in personam jurisdiction attack

fails on at least two prongs, we need not address the third.[6]

The findings of guilty and the sentence are affirmed.

Senior Judge JOHNSTON and Judge ECKER concur.

# APPENDIX

## Article III

1. On the conditions specified in paragraph 2 of this Article and subject to compliance with the formalities established by the receiving State relating to entry and departure of a force or the members thereof, such members shall be exempt from passport and visa regulations and immigration inspection on entering or leaving the territory of a receiving State. They shall also be exempt from the regulations of the receiving State on the registration and control of aliens but shall not be considered as acquiring any right to permanent residence or domicile in the territories of the receiving State.

2. The following documents only will be required in respect of members of a force. They must be presented on demand:

a. personal identity card issued by the sending State showing names, date of birth, rank and number (if any), service, and photograph;

b. individual or collective movement order, in the language of the sending State and in the English and French languages, issued by an appropriate agency of the sending State or of the North Atlantic Treaty Organisation and certifying to the status of the individual or group as a member or members of a force and to the movement ordered.

---

5. Affidavits and other attachments submitted by the parties have raised a factual question which goes to the unwaivable issue of jurisdiction. We need not, however, remand the case to the trial level for a *United States v. DuBay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411, 1967 WL 4276 (C.M.A. 1967), proceeding, as we determine that appellant's jurisdictional attack fails on other grounds.

6. Soldiers no longer receive a final cash payment upon termination of service in most instances.

Verification of pay data and debt recoupment at centralized finance and accounting offices, followed by an electronic transfer of funds to the soldier's financial institution of choice, has replaced the time honored practice of reporting to the finance office and receiving "cold cash." Current technology and accounting practices may have changed the analysis necessary for determining when a final accounting of pay has occurred.

The receiving State may require a movement order to be countersigned by its appropriate representative.

3. Members of a civilian component and dependents shall be so described in their passports.

4. If a member of a force or of a civilian component leaves the employ of the sending State and is not repatriated, the authorities of the sending State shall immediately inform the authorities of the receiving State, giving such particulars as may be required. The authorities of the sending State shall similarly inform the authorities of the receiving State of any member who has absented himself for more than twenty-one days.

5. If the receiving State has requested the removal from its territory of a member of a force or civilian component or has made an expulsion order against an ex-member of a force or of a civilian component or against a dependent of a member or ex-member, the authorities of the sending State shall be responsible for receiving the person concerned within their own territory or otherwise disposing of him outside the receiving State. This paragraph shall apply only to persons who are not nationals of the receiving State and have entered the receiving State as members of a force or civilian component or for the purpose of becoming such members, and to the dependents of such persons.