RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0221p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee,*

    *v.*

                  Nos. 09-6108/6123

STEVEN D. GREEN,

                *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Kentucky at Paducah.
No. 06-00019-001—Thomas B. Russell, Chief District Judge.

Argued: January 21, 2011

Decided and Filed: August 16, 2011

Before: MARTIN and STRANCH, Circuit Judges; THAPAR, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Scott T. Wendelsdorf, WESTERN KENTUCKY FEDERAL COMMUNITY DEFENDER, INC., Louisville, Kentucky, for Appellant. Michael A. Rotker, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Scott T. Wendelsdorf, Frank W. Heft, Jr., Patrick J. Bouldin, WESTERN KENTUCKY FEDERAL COMMUNITY DEFENDER, INC., Louisville, Kentucky, Darren C. Wolff, Louisville, Kentucky, for Appellant. Michael A. Rotker, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

      MARTIN, J., delivered the opinion of the court, in which STRANCH, J., joined. THAPAR, D. J. (p. 23), delivered a separate concurring opinion.

_____

[*] The Honorable Amul R. Thapar, United States District Judge for the Eastern District of Kentucky, sitting by designation.

————————————

## OPINION

————————————

BOYCE F. MARTIN, JR., Circuit Judge.  Steven D. Green was convicted and sentenced to life in prison for participating in a sexual assault and multiple murders while stationed in Iraq as an infantryman in the United States Army.  Before senior Army officials became aware that Green and three fellow servicemembers were involved in these crimes, Green was discharged due to a personality disorder.  When officials discovered Green's involvement in the crimes, his three coconspirators were still on active duty in the Army and thus subject to the Uniform Code of Military Justice.[1]  They were tried by courts-martial and each sentenced to between 90 and 110 years imprisonment, which rendered them eligible for parole in ten years.  However, the Army had no authority to court-martial Green because he had already been discharged.  Thus, civilian prosecutors charged Green under the Military Extraterritorial Jurisdiction Act,[2] which extends federal criminal jurisdiction to persons who commit criminal acts while a member of the Armed Forces but later cease to be subject to military jurisdiction.  A federal court jury convicted Green of a number of crimes, including murder and sexual assault, and the district court sentenced him to five consecutive life sentences.  Green claims that the district court lacked jurisdiction to try him because he was never validly discharged from the Army and thus never ceased to be subject to military law as required by MEJA.  Furthermore, he claims that MEJA is unconstitutional because it violates the separation-of-powers principle and the nondelegation doctrine, equal protection, and due process.  We find that these arguments fail and thus **AFFIRM** the decision of the district court.

————————————

[1]We refer to the Uniform Code of Military Justice, 10 U.S.C. § 802 (2006), as UCMJ.

[2]We refer to the Military Extraterritorial Jurisdiction Act, 18 U.S.C. § 3261, as MEJA.

**I. BACKGROUND**

On February 16, 2005, Green enlisted in the United States Army for a period of four years and nineteen weeks. After completing basic training, Green was assigned as an infantryman to Company B, First Battallion, 502nd Infantry Regiment of the 101st Airborne (Air Assault), stationed at Fort Campbell, Kentucky. On September 24, with a scant six months of training, Green was deployed to Iraq, where he was assigned in and around Mahmoudiyah, Iraq, just south of Baghdad. The events that precipitated Green's federal prosecution occurred while he was stationed in Iraq with the 101st.

On the afternoon of March 12, 2006, Green, and fellow members of his unit, Paul Edward Cortez, James Paul Barker, Jesse Von-Hess Spielman, and Bryan Lee Howard, were playing cards and drinking whiskey, in violation of Army General Order 1, at an Army traffic checkpoint known as TCP-2, when Green stated that he wanted to kill some Iraqi civilians because of the deaths of several fellow infantrymen. After Green persisted, Barker eventually agreed to go along with Green's plan, and he told Green that he knew a nearby house where an Iraqi man and three females lived. Barker also suggested that they have sex with one of those females. Green and Barker persuaded Cortez and Spielman to accompany them.

Before leaving, Barker and Cortez changed into black clothing and covered their heads with black ski masks; Green disguised himself by wrapping a brown Army-issued undershirt across his face. As they departed, Green carried a shotgun; the others carried either an M-14 or an M-4 military issued rifle. Howard remained at TCP-2 and was instructed to alert the others with an ICOM, a walkie-talkie-like device, if he saw any Army personnel approaching TCP-2. The group left TCP-2 through a gap in the wire fence surrounding it and headed into a field, which led to a chain-link fence some 400 meters away. The group cut a hole in the fence and passed through to the other side. Once there, Green and his cohorts ran to the house Barker had selected. Green and Spielman approached a man, Kassem Hamza Rachid Al-Janabi, and his six-year-old daughter, Hadeel Kassem Hamza Al-Janabi, who were standing outside, and forced them inside. Fakhriya Taha Mohsine Al-Janabi, Kassem's wife, was present inside, along

with fourteen-year-old Abeer Kassem Hamza Al-Janabi.  Green and Spielman then forced Kassem, Fakhriya, and Hadeel into a bedroom.  Spielman closed the door to that room and stood outside, leaving Green inside the room.  Meanwhile, Cortez and Barker pulled Abeer into the living room.  Cortez pushed her to the ground, pulled off some of her clothes, including her pantyhose, and pushed her dress up above her waist.  Cortez and  Barker then took turns raping her while forcibly restraining her.  During the rape, a flurry of gunshots went off inside the bedroom.  Responding to Spielman's knocking, Green opened the door and told Spielman that he was okay.  Spielman and Green then entered the living room.  Green placed an AK-47 rifle that he had brought with him from the bedroom in the corner of the living room, and announced that everyone else was dead and that he had killed them.  Green, who at that point was "wigging out, acting all irate, breathing heavy, and pacing a little," began sexually assaulting Abeer while Cortez held her arms down.  When Green finished assaulting Abeer, he retrieved the AK-47 rifle, covered Abeer's head with a pillow, and shot her several times in the face with the rifle.  A member of the group then suggested that they burn Abeer's body, so Barker poured kerosene from a lamp he had found onto Abeer's body; someone then lit her body on fire.  The group then exited the house after Green stated that he had opened a propane-tank valve in the house in order to set off an explosion.  The group returned to TCP-2 the same way they had come.  When they arrived, some of them removed their clothing and placed it in an exterior burn pit used for refuse.  Cortez ordered Spielman to dispose of the AK-47 rifle, which Green had brought back with him; Spielman took the rifle and threw it into the canal across from TCP-2.  Green was later overheard describing the events of the day as "awesome."

Later that afternoon, Iraqi civilians reported to TCP-1, another nearby traffic checkpoint, that a house located behind TCP-2 had been burned, and that several bodies, one of whom was a woman who apparently had been raped and burned, were inside. The noncommissioned officer in charge of TCP-1 called TCP-2 and stated that he was sending a patrol to check on the house behind TCP-2 and that he needed additional manpower.  Twenty or so minutes later, Sergeant Anthony Yribe proceeded to TCP-2 with an Iraqi interpreter and several members of the Iraqi Army who were also stationed

at TCP-1. They, along with Cortez and Spielman, went to the house to investigate. Upon their arrival, the investigation team immediately observed the deceased remains of a woman who had been shot in the face with a substantial portion of her body burned beyond recognition. The team also discovered three dead bodies in an adjacent room, each of whom had been shot at close range in the head or the chest. The investigation team attributed these killings to Iraqi counterinsurgents, and no crime scene investigation was initiated. When the investigation team returned to TCP-2, Green, in Barker's presence, told Yribe that he killed those people. Yribe met later that day with his superior and with the company commander, Captain John Goodwin, about the investigation, but he did not disclose Green's admission. The next day, March 13, Yribe, in Barker's presence, asked Green about the events of the prior day, and Green again admitted to committing the murder.

On March 28, 2006, following an earlier meeting with a Combat Stress Team, Green was diagnosed with an anti-social personality disorder and an adjustment disorder with depressed mood. On April 2, Brigade Commander Colonel Todd J. Ebel requested Green's early release from the Iraqi theater of operations on grounds of a personality disorder—a permissible basis for the Army to discharge an enlisted soldier prior to his completion of his term of service. *See* Army Regulation 635-200 ¶ 5-13 (permitting the Army to discharge a soldier "because of a personality disorder"). On April 14, Green received a written notice from his company commander, Goodwin, indicating that he was initiating action pursuant to Army Regulation 635-200 ¶ 5-13 to separate Green from the military because of his personality disorder based on a determination that it "interferes with [Green's] ability to perform [his] duties and be a productive soldier." Goodwin recommended that Green receive an honorable discharge. Green signed the notice on April 16. On May 3, Green was released from the Iraqi theater of operations. At no point prior to his release did Green assert that the Army failed to follow its personnel regulations or that his discharge from the Army was invalid. On May 9, Green received his separation orders reassigning him to Fort Campbell, Kentucky for transition processing. The separation order stated that, "after processing," Green would be discharged from the component shown—the 101st Airborne (Air Assault)—as of May

16, unless that order was changed or rescinded. On May 11, Green completed and signed a Department of Defense Form 2648, Preseparation Counseling Checklist for Active Component Service Members. Green later received an Installation Final Clearance Memorandum stating that he had completed installation clearance and was eligible for discharge on May 16. On May 15, Green's separation order was stamped "Final Installation Clearance." On May 16, 2006, fifteen months after enlisting in the Army, Green received his final pay, and was issued a Department of Defense Form 214, Certificate of Release or Discharge From Active Duty, indicating an honorable discharge due to a personality disorder.

On June 20, 2006, during a debriefing with a combat stress counselor, Private First Class Justin Watt, a member of Green's former unit, stated that American soldiers had raped and killed an Iraqi female and killed three other Iraqis in March 2006. This information, which contradicted the initial investigation team's report blaming those killings on Iraqi counterinsurgents, was conveyed up the chain of command. On June 24, the battalion commander interviewed Barker, Cortez, Spielman, and Howard. The commander then referred the information he had gathered to the United States Army Criminal Investigation Division (CID), which began a formal criminal investigation. CID investigators interviewed witnesses, including Barker, Cortez, Spielman, and Howard, each of whom provided a written statement admitting to varying degrees of participation in both the sexual assault of Abeer and the ensuing murders. Barker, Cortez, and Spielman identified Green as the triggerman for all four murders. Investigators also obtained a written statement from Yribe, in which he revealed the two incriminating statements that Green had made to him shortly after the crimes. In addition, investigators met with a friend of Green's and two other soldiers, each of whom stated that Green had admitted that he had raped an Iraqi girl and killed her and her family.

Barker, Cortez, Spielman, and Howard were then prosecuted by the Army under UCMJ for their roles in the Al-Janabi massacre. Barker, Cortez, and Spielman were each court-martialed on charges including murder, conspiracy, obstruction of justice,

arson, and housebreaking. In exchange for their pleas of guilty, which entailed their dishonorable discharges, the convening authority agreed to cap their sentences at 90, 100, and 110 years in confinement, respectively, which had the effect of rendering them eligible for parole in ten years.[3]

The Army had no authority to court-martial Green because he was no longer a soldier, and the general federal criminal statutes do not extend to his conduct overseas. Thus, civilian prosecutors charged him under MEJA for his role in the crimes committed against the Al-Janabi family. On November 2, a federal grand jury returned an indictment against Green charging him with sixteen crimes: conspiracy to commit murder (Count 1), conspiracy to commit aggravated sexual abuse (Count 2), four counts of premeditated murder (Counts 3-6), four counts of felony murder (Counts 7-10), aggravated sexual abuse (Count 11), aggravated sexual abuse of a child (Count 12), and four counts of using a firearm during and in relation to a crime of violence (Counts 13-16). In addition, Count 17 charged Green with obstruction of justice under 18 U.S.C. § 1512(c)(1) (2006).

The indictment included a notice of special findings as to Counts 3-10 and 13-16 which, if proven, would have rendered Green eligible for the death penalty. The United States later gave notice of its intent to seek the death penalty. Because of this, Green could not plead guilty but had to be tried.

By letter dated February 15, 2007, Green volunteered to reenlist in the Army in order to subject himself to the military justice system. The Army declined his request.

On February 15, 2008, Green filed two motions to dismiss. He claimed that: (1) the district court lacked jurisdiction over him because he never ceased to be subject to military prosecution under UCMJ, as required by MEJA; and (2) MEJA violates the

---

[3]Howard was court-martialed and convicted of being an accessory after the fact and conspiring to obstruct justice, for which he received a twenty-seven month sentence, reduction in rank to Private, and a dishonorable discharge. Yribe, who was charged with dereliction of duty and making false official statements, requested a discharge in lieu of trial by court-martial, and that request was approved with an Other Than Honorable Discharge, reduction in rank to Private, and the dismissal of the charges against him.

separation-of-powers principle, the nondelegation doctrine, and the Due Process Clause of the Fifth Amendment.  The district court denied both motions.

The jury heard proof in the guilt-innocence phase of the trial from April 27 to May 7, 2009.  The government dismissed Count 12 (aggravated sexual abuse of a child) before the case was submitted to the jury.  On May 7, the jury convicted Green on all sixteen remaining counts.

The parties presented sentencing phase evidence from May 11 to May 20.  The jury was unable to reach a unanimous decision on whether Green should be sentenced to death.  On September 4, the district court sentenced Green to life imprisonment on Counts 1 and 3-11, five years imprisonment on Count 2, and twenty years imprisonment on Count 17, all to run concurrently.  The district court also sentenced Green to life sentences on Counts 13-16, to run consecutively to each other and to the sentences imposed on all other counts.  Thus, the district court sentenced Green to a total of five consecutive life sentences.  Green now appeals.

## II. STATUTORY FRAMEWORK

Under UCMJ, "[m]embers of a regular component of the armed forces" are subject to court-martial jurisdiction.  10 U.S.C. § 802(a)(1).  However, the Army has no authority to court-martial those who are no longer members of the armed services.  *See United States ex rel. Toth v. Quarles*, 350 U.S. 11, 14 (1955).  Furthermore, with the exception of a limited number of statutes that specifically provide otherwise, our federal criminal laws generally extend only to conduct that occurs within the special maritime and territorial jurisdiction of the United States.[4]  Thus, for many years there was a "jurisdictional gap" that allowed exservicemembers to escape prosecution for crimes committed on foreign soil while a member of the Armed Forces.  H.R. Rep. No. 106-778, pt. 1, at 5 (2000).  In 2000, Congress passed MEJA to "close this gap."  *Id.*  MEJA, 18 U.S.C. § 3261(a), provides that:

---

[4]This jurisdiction includes "[a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof."  18 U.S.C. § 7(3).

Whoever engages in conduct outside the United States that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States—
> (1) while employed by or accompanying the Armed Forces outside the United States; or
> (2) while a member of the Armed Forces subject to chapter 47 of title 10 (the Uniform Code of Military Justice),

shall be punished as provided for that offense.

However, MEJA provides limitations on when a member of the Armed Forces may be subject to civilian prosecution. The limitations in 18 U.S.C. § 3261(d) state that:

No prosecution may be commenced against a member of the Armed Forces subject to chapter 47 of title 10 (the Uniform Code of Military Justice) under this section unless—
> (1) such member ceases to be subject to such chapter; or
> (2) an indictment or information charges that the member committed the offense with one or more other defendants, at least one of whom is not subject to such chapter.

## III. ANALYSIS

We pause to explain why Green was tried in the United States rather than in Iraq. MEJA provides that "[n]o prosecution may be commenced against a person under this section if a foreign government, in accordance with jurisdiction recognized by the United States, has prosecuted or is prosecuting such person for the conduct constituting such offense, except upon the approval of the Attorney General or the Deputy Attorney General." 18 U.S.C. § 3261(b). However, Iraq could not prosecute Green because a rule with the force of law enacted by the Coalition Provisional Authority stipulates that coalition forces "shall be immune from the Iraqi legal process." Paul L. Bremer, Coalition Provisional Authority Order Number 17 (Revised), June 27, 2004, *available at* http://www.iraqcoalition.org/regulations/20040627_CPAORD_17_Status_of_Coalition__Rev__with_Annex_A.pdf (last visited June 28, 2011). Furthermore, Green's prosecution did not violate principles of international law because the nationality principle provides for extraterritorial jurisdiction based on the nationality of the offender.

*Cf. United States v. Brehm*, No. 1:11-CR-11, 2011 WL 1226088, at *6 n.9 (E.D. Va. Mar. 30, 2011); *United States v. Williams*, 722 F. Supp. 2d 1313, 1319 (M.D. Ga. 2010).

The testimony at the trial established that while many were to blame for the breakdown that led up to this tragedy, there was no single cause. There was, however, no question of Green's guilt. Green should never have been accepted by the Army. His testing at enlistment was marginal at best. His training was limited. Once in Iraq, the supervisory non-commissioned officers as well as the commissioned officers of his historic unit failed in their duties. These failures were partly because war in Iraq was very different from past U.S. Army experience. The best description of the fear and horror soldiers in Iraq face is found in David Finkel's book, *The Good Soldiers*. The book describes a unit not unlike that battalion where Green was assigned,[5] and the fear from sudden attacks during patrols and the loss of comrades to unseen attackers who blended into the population that the soldiers faced. The difference between the unit in which Green served, the 1-502nd, and the 2-16 of *The Good Soldiers* was command leadership. We will never know the whole story of why Green and his fellow infantrymen went crazy on the afternoon of March 12, 2006. These events are, in part, a leadership failure but nonetheless a blot on the storied honor of the famed Screaming Eagles of World War II, Vietnam, and the first days of the invasion of Iraq and the one million men and women who have served in the 101st.

Given the proof at trial, guilt was proved beyond any doubt and thus we need address only the statutory and constitutional issues raised by Green on appeal. This opinion is divided into two parts. First, we hold that the district court had jurisdiction to try Green under MEJA because he had been validly discharged from the Army. Second, we hold that MEJA is constitutional because it does not violate the separation-of-powers principle or the nondelegation doctrine, equal protection, or due process.

---

[5]*The Good Soldiers* profiles the Second Battalion, Sixteenth Infantry Regiment, 4th Infantry Brigade Combat Team, First Infantry Division. David Finkel, *The Good Soldiers* (2009).

**A. Jurisdiction**

We first address Green's statutory claim on the chance that it might obviate the need to address his constitutional claims. *See, e.g.*, *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

For an exserviceman to be subject to prosecution under MEJA, he must: (1) engage in conduct outside the United States; (2) that would constitute an offense punishable by imprisonment for more than one year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States; (3) while a member of the Armed Forces subject to UCMJ. 18 U.S.C. § 3261(a). The parties agree that these three elements are met. However, MEJA further provides that a member of the Armed Forces subject to UCMJ may not be prosecuted under MEJA unless: (1) he or she ceases to be subject to UCMJ; or (2) an indictment or information charges that he or she committed the offense with one or more defendants, at least one of whom is not subject to UCMJ. *Id.* § 3261(d). Green claims that the Army's failure to follow certain regulations rendered his May 16 discharge invalid, and therefore the district court lacked jurisdiction to try him because he never ceased to be subject to UCMJ as required by MEJA.

The question of military jurisdiction is characterized as a question of personal jurisdiction. *See, e.g.*, *United States v. Howard*, 20 M.J. 353, 354 (C.M.A. 1985). We review "*de novo* challenges to a court's decision to exercise personal jurisdiction." *Tobin v. Astra Pharm. Prods., Inc.*, 993 F.2d 528, 532 (6th Cir. 1993).

**1. Standing**

Before reaching the merits of Green's statutory claim, the district court remarked that there was substantial authority supporting the view that military authorities may have waived jurisdiction over Green, and Green thus may not have had standing to claim that the district court lacked jurisdiction over him. Although the parties did not address

these issues in their briefs, we have an obligation to raise standing issues *sua sponte*. *Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103, 109 (2001).

It is well accepted that military authorities may waive jurisdiction over a member of the Armed Forces. *See, e.g.*, *Harris v. Hunter*, 170 F.2d 552, 553 (10th Cir. 1948) (citing *Ponzi v. Fessenden*, 258 U.S. 254, 260 (1922)). Here, military authorities may have waived jurisdiction over Green by notifying civilian authorities of his crimes and allowing them to prosecute him. *Cf. id.* ("[T]he military authorities could waive their prior jurisdiction and are presumed to have done so, in the absence of an affirmative showing to the contrary."); *Ex parte Sumner*, 158 S.W.2d 310, 311-12 (Tex. Crim. App. 1942) (stating that military authorities waived jurisdiction by delivering appellant to civilian authorities). However, even if the military waived jurisdiction over Green, that does not mean that he ceased to be subject to UCMJ as required by 18 U.S.C. § 3261(d).

If both military and civilian authorities had jurisdiction to try Green, then he would have no standing to contest the forum in which he would be tried. *See, e.g.*, *United States v. Murphy*, 50 M.J. 4, 7 (C.A.A.F. 1998); *Bowman v. Wilson*, 672 F.2d 1145, 1156 (3d Cir. 1982); *Harris*, 170 F.2d at 553 ("[I]f the civil authorities exercised jurisdiction over petitioner, without the consent of, and even over the protest of the military authorities, only the military authorities could raise the question by asserting their prior rights to the possession of the petitioner."); Rules for Courts-Martial (R.C.M.) 201(d)(3) ("Where an act or omission is subject to trial by court-martial and by one or more civil tribunals, . . . the determination which nation, state, or agency will exercise jurisdiction is a matter for the nations, states, and agencies concerned, and is not a right of the suspect or accused."). However, here Green is not arguing that he should have been tried by military authorities although civilian authorities had concurrent jurisdiction over him; he is arguing that the district court lacked jurisdiction to try him under MEJA because he never ceased to be subject to UCMJ. Thus, Green has standing to contest the district court's jurisdiction over him.

**2. Personal Jurisdiction**

Because of the lack of decided cases in our sister circuits, we have sought guidance from decisions of the United States Court of Military Appeals. It has held that "[i]t is black letter law that in personam jurisdiction over a military person is lost upon his discharge from the service, absent some saving circumstance or statutory authorization." *Howard*, 20 M.J. at 354. Although UCMJ does not define the point in time when discharge occurs, courts look to 10 U.S.C. §§ 1168(a) and 1169 to determine the requirements to effectuate a discharge. Section 1168(a) states that "[a] member of an armed force may not be discharged or released from active duty until his discharge certificate or certificate of release from active duty, respectively, and his final pay or a substantial part of that pay, are ready for delivery." Section 1169 provides that: "[n]o regular enlisted member of an armed force may be discharged before his term of service expires, except—(1) as prescribed by the Secretary concerned; (2) by sentence of a general or special court martial; or (3) as otherwise provided by law."

Courts have read sections 1168(a) and 1169 as requiring that three elements, known as the *King* elements, be satisfied to accomplish an early discharge: "(1) a delivery of a valid discharge certificate; (2) a final accounting of pay; and (3) the undergoing of a 'clearing' process as required under appropriate service regulations to separate the member from military service." *United States v. Harmon*, 63 M.J. 98, 101 (C.A.A.F. 2006) (citing *United States v. King*, 27 M.J. 327, 329 (C.M.A. 1989)). Green concedes that the first and second elements of a proper discharge were met because he received a copy of Department of Defense Form 214 and a final accounting of pay. However, Green contends that the clearing process in his case failed to comply with Army Regulations and thus rendered his discharge invalid.

Here, the district court incorrectly held that Green's discharge was complete when Army officials delivered to him a Department of Defense Form 214 with the intent to discharge him, regardless of the second and third *King* elements. While not binding on us, the Court of Appeals for the Armed Forces has expressly rejected the position that

the second and third *King* elements are relevant only to determine a commander's intent regarding discharge:

> There are no prior decisions of this court that have held that the date on the [Department of Defense] Form 214 determines the effective date of discharge for UCMJ purposes . . . . Nor has the application of 10 U.S.C. § 1168(a) ever been limited by this court to only those situations where "the unsettled state of the record requires consideration of multiple factors."

*United States v. Hart*, 66 M.J. 273, 275 n.4 (C.A.A.F. 2008). We accept this interpretation and thus the district court erred in suggesting that the clearing process was not necessary to effect a valid discharge. However, this does not end the inquiry because the district court correctly found that the Army complied with the requirements of outprocessing Green as contemplated by *King*. The clearing process refers to a serviceman's administrative separation or outprocessing from the Army. *See United States v. Melanson*, 50 M.J. 641, 644 (A. Ct. Crim. App. 1999); *United States v. King*, 37 M.J. 520, 522 (A.C.M.R. 1993). Green received separation orders stating that he would be discharged on May 16 unless the order was changed or rescinded. On May 11, Green completed the preseparation counseling checklist, and the Chief of Fort Campbell's In/Out Processing issued an Installation Final Clearance memorandum stating that Green had completed the installation clearance and was eligible to depart on May 16. On May 15, Green's transition orders were stamped "FINAL INSTALLATION CLEARANCE." These actions are sufficient evidence to demonstrate that Green completed the outprocessing as contemplated by *King*.

Green contends that his discharge was invalid because it failed to comply with Army Regulations 635-10, 635-19, and 635-200, which required the Army to: (1) collect his identification card; (2) conduct a departure ceremony; (3) advise him to apply for compensation; and (4) provide him with formal counseling. However, Green has cited no authority holding that these regulations are essential parts of the clearing process such that strict compliance is necessary to effectuate a valid discharge. These regulations involve ceremonies and briefings intended to aid a soldier's transition to civilian life, and they are thus related to the separation process. They are not the sort of formal

requirements that determine whether the administrative clearing process required for discharge has been completed.  Green's discharge was valid because the Army complied with the three *King* elements by: (1) delivering a valid discharge certificate; (2) providing a final accounting of pay; and (3) conducting a clearing process.

## B. Constitutional Claims

We turn now to Green's constitutional arguments: that MEJA offends the separation-of-powers principle and the nondelegation doctrine.  He also argues that it denies him equal protection, and due process.  We review de novo a district court's decision regarding the constitutionality of a statute.  *United States v. Sawyers*, 409 F.3d 732, 735 (6th Cir. 2005), *abrogated on other grounds by United States v. Vanhook*, 640 F.3d 706 (6th Cir. 2011).

## 1. Separation-of-Powers and Nondelegation

The Constitution divides the powers of the federal government into the legislative, executive, and judicial branches, and provides safeguards to assure that each branch will confine itself to its designated responsibilities.  *I.N.S. v. Chadha*, 462 U.S. 919, 951 (1983). The tripartite federal government includes a system of checks and balances as "a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *Buckley v. Valeo*, 424 U.S. 1, 122 (1976).  Each branch of the government "may not intrude upon the central prerogatives of another." *Loving v. United States*, 517 U.S. 748, 757 (1996).

Just as the executive and judicial branches may not encroach on the power of Congress, Congress may not abdicate its responsibility to either of these two branches. The Supreme Court has emphasized that "the integrity and maintenance of the system of government ordained by the Constitution mandate that Congress generally cannot delegate its legislative power to another Branch." *Mistretta v. United States*, 488 U.S. 361, 371-72 (1989) (internal quotation marks omitted).  The Supreme Court has recognized that "the separation-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate

Branches." *Id.* at 372. "So long as Congress 'shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power.'" *Id.* (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

The Constitution grants Congress the power to define federal crimes, fix sentences, and regulate the procedure of federal courts. *See* U.S. Const. Art. I, § 1; *Mistretta*, 488 U.S. at 364; *Sibbach v. Wilson & Co.*, 312 U.S. 1, 9 (1941). Green argues that MEJA constitutes an unconstitutional delegation by Congress to the executive branch of its power to define crimes, punishments, and adjudicative procedures. MEJA does provide the executive branch with discretion regarding whether to extend civilian criminal jurisdiction to a member of the Armed Forces who committed the offense with a defendant who is not subject to UCMJ. *See* 18 U.S.C. § 3261(d)(2). However, MEJA provides the executive branch with no discretion regarding the forum in which to prosecute a former member of the Armed Forces such as Green, because such a person is not subject to military criminal jurisdiction. *See Quarles*, 350 U.S. at 23. Thus, we decline to address the constitutionality of any delegation of discretion in MEJA because it does not apply in Green's case. *Cf. Lyng*, 485 U.S. at 445 ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

Green also appears to argue that MEJA violates the separation-of-powers principle by unconstitutionally enhancing the executive branch's power to prosecute. This argument also fails. MEJA does not offend the separation-of-powers doctrine because it does not present "the encroachment or aggrandizement of one branch *at the expense of the other*." *Buckley*, 424 U.S. at 122 (emphasis added). MEJA does expand criminal liability and thus increases the power of the executive branch to enforce the law. However, this is no different from any other federal law that increases the categories of conduct deemed criminal and thus provides the executive branch with a new opportunity to exercise its power to prosecute. MEJA's expansion of the executive branch's power

to prosecute does not come at the expense of either of the other two branches.  Thus, MEJA does not violate the separation-of-powers principle.

**2. Equal Protection**

Green argues that the government's decision to prosecute him under MEJA in the civilian justice system while prosecuting his coconspirators under UCMJ in the military justice system deprived him of equal protection.  The district court correctly focused on prosecutorial discretion in finding that Green's prosecution in the civilian justice system did not offend equal protection.  *Cf. United States v. Moore*, 543 F.3d 891, 899 (7th Cir. 2008) ("[T]he purported irrationality identified by [defendant]—the decision to prosecute him . . . in federal, rather than state, court—originated with a decision that was made in the prosecutorial sphere.  Thus, . . . his argument is nakedly aimed at the exercise of prosecutorial discretion.").

The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  The purpose of this provision is "to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Sioux City Bridge Co. v. Dakota Cnty.*, 260 U.S. 441, 445 (1923) (internal quotation marks and citation omitted).  Although the Fourteenth Amendment applies on its face only to the states, the Due Process Clause of the Fifth Amendment imposes equal protection constraints on the federal government.  *See Bolling v. Sharpe*, 347 U.S. 497, 498-99 (1954).  Equal protection challenges are "typically . . . concerned with governmental classifications that affect some groups of citizens differently than others." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008) (internal quotation marks and citation omitted).  However, the Supreme Court has recognized that a "class-of-one" may bring an equal protection claim where the plaintiff alleges that: (1) he or "she has been intentionally treated differently from others similarly situated"; and (2) "there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  Green fails to meet either of these two elements.

Green does not meet the first element of a class-of-one claim that he has been intentionally treated differently from others similarly situated.  This Court has not yet defined the extent to which individuals must be similarly situated to others in order to maintain a class-of-one claim.  The Seventh Circuit has held that to be similarly situated, the challenger and his comparators must be "*prima facie* identical in all relevant respects or directly comparable . . . in all material respects."  *Moore*, 543 F.3d at 896 (internal quotation marks and citation omitted).  Similarly, this Court has explained in the employment discrimination context that "similarity between the compared employees must exist in all relevant aspects of their respective employment circumstances."  *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994).

Green claims that he was similarly situated to his coconspirators because they all participated in committing the same crimes in a single criminal episode and it was possible to have tried them all in the same forum.  Furthermore, Green argues that the difference between his legal status and that of his coconspirators cannot be attributed to any action by Green because it resulted from either: (1) his discharge initiated by the Army; (2) the Army's refusal to allow him to reenlist; or (3) the government's decision not to prosecute his coconspirators in federal court.

Green confuses the time frame in which he must prove he is similarly situated to his coconspirators.  Green was similarly situated to his coconspirators at the time of the crime because they were all members of the Army who participated in some capacity in the same criminal conduct.  However, because Green appears to raise an equal protection claim based on the government's charging decision, he must prove that he was similarly situated to his coconspirators at the charging stage.  *Cf. Moore*, 543 F.3d at 897 (analyzing equal protection claim at charging stage and at sentencing stage).  At the time that the prosecution charged Green, it is undisputed that the Army had discharged him but not his coconspirators.  Green does not claim that the Army believed that any of his coconspirators had personality disorders or that his discharge violated equal protection.  In fact, the Army discharged him pursuant to a valid Army Regulation, and his discharge complied with the relevant federal laws and regulations.  Because Green was not

similarly situated to his coconspirators at the time of the charging decision, his equal protection claim fails. *See Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 575 (6th Cir. 2008).

Green also fails to prove the second element of a class-of-one claim that there is no rational basis for the difference in treatment. Under the rational basis test, courts will not overturn government action "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [government's] actions were irrational." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 84 (2000) (internal quotation marks and citation omitted). There are two ways that a "class-of-one" plaintiff may demonstrate that a government action lacks a rational basis: (1) showing pure arbitrariness by negativing every conceivable basis that might support the government's decision; or (2) showing an illegitimate motive such as animus or ill will. *Warren v. City of Athens, Ohio*, 411 F.3d 697, 711 (6th Cir. 2005). Green cannot succeed under either of these two bases.

Green does not argue that the government's decision to prosecute him under MEJA was motivated by an illegitimate motive such as animus or ill will. It is unclear whether arbitrariness is a permissible basis on which to challenge a prosecutorial charging decision. *Compare Moore*, 543 F.3d at 899-900 (holding that a class-of-one challenge to a prosecutorial charging decision may only be based on an illegitimate-motive theory, rather than a showing of pure arbitrariness), *and United States v. Hawkins*, 274 F.3d 420, 427-29 (6th Cir. 2001) (holding that a defendant could not challenge the government's refusal to file a motion for downward departure for pure arbitrariness), *with Franks v. Rubitschun*, 312 F. App'x 764, 766 n.3 (6th Cir. 2009) (disagreeing with the proposition that individualized, discretionary decisions can rarely, if ever, be challenged in class-of-one actions). However, even if arbitrariness is a permissible basis on which to challenge a prosecutorial charging decision, Green does not show pure arbitrariness by negativing every conceivable basis that might support the government's decision, because he fails to negative the United States's claim that the

decision to prosecute him under MEJA was based on the absence of any other forum in which he could be prosecuted.  Thus, Green's equal protection claim fails.

### 3. Due Process

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  This provision encompasses two forms of protection: substantive due process and procedural due process.  Substantive due process "prevents the government from engaging in conduct that shocks the conscience . . . or interferes with rights implicit in the concept of ordered liberty."  *United States v. Salerno*, 481 U.S. 739, 746 (1987) (internal quotation marks and citation omitted).  Procedural due process requires that "[w]hen government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner."  *Id.*

The Supreme Court has held that the existence of two statutes providing different penalties for identical conduct does not violate due process.  *United States v. Batchelder*, 442 U.S. 114, 125 (1979).  The Court first noted that it had long recognized that when an act is punishable under more than one statute, "the Government may prosecute under either so long as it does not discriminate against any class of defendants. . . .  Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion."  *Id.* at 123-24.  The Court held, *id.* at 124-25, that:

> [A] prosecutor's discretion to choose between [two statutes] is not "unfettered." . . . [T]here is no appreciable difference between the discretion a prosecutor exercises when deciding whether to charge under one of two statutes with different elements and the discretion he exercises when choosing one of two statutes with identical elements. . . . Just as a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution neither is he entitled to choose the penalty scheme under which he will be sentenced.

Similarly, the D.C. Circuit has held that a United States Attorney may constitutionally decide to transfer a defendant from local court to federal court in order to obtain a longer

prison sentence. *United States v. Mills*, 925 F.2d 455, 461-62 (D.C. Cir. 1991), *aff'd in relevant part*, 964 F.2d 1186 (D.C. Cir. 1992) (en banc). The D.C. Circuit, *id.*, noted that:

> It is established . . . that the U.S. Attorney for the District of Columbia may elect to prosecute a given criminal defendant on federal rather than District charges, even though the former carry stiffer penalties. . . . In fact, the prosecutor may select one alternative charge over another precisely *because* the selected offense carries a more severe sentence. . . . If the prosecutor's exercise of this discretion is rational and nondiscriminatory, . . . there generally is no basis for finding a violation of due process.

Green claims that his prosecution in a civilian court constitutes a violation of substantive and procedural due process because all of the post-crime events that enabled the United States to acquire jurisdiction were initiated by military or civilian personnel. There is some authority for the proposition that an exercise of prosecutorial discretion may not be challenged for arbitrariness under the doctrine of substantive due process. *See United States v. Smith*, 953 F.2d 1060, 1063 (7th Cir. 1992) ("Arbitrariness . . . is not among the grounds on which to contest an exercise of prosecutorial discretion."). Furthermore, even if an exercise of prosecutorial discretion may be challenged for arbitrariness under the substantive due process rubric, which we do not decide here, Green fails to demonstrate that his discharge from the Army and prosecution under MEJA shocks the conscience or interferes with rights implicit in the concept of ordered liberty. The Supreme Court has approved the concept of extending federal criminal jurisdiction over discharged soldiers accused of offenses committed while in the armed services. *See Quarles*, 350 U.S. at 21 ("[I]t was wholly within the constitutional power of Congress to . . . provide for federal district court trials of discharged soldiers accused of offenses committed while in the armed services."). It is unnecessary to address the constitutionality of the Army discharging a soldier specifically in order to subject him to federal jurisdiction because the record reveals that Green was discharged due to a personality disorder before senior Army officials became aware of his involvement in the offenses committed against the Al-Janabi family. Thus, Green's prosecution under MEJA does not violate due process.

## IV. CONCLUSION

Green's claim that the district court lacked jurisdiction over him fails because his discharge from the Army was valid. Furthermore, Green's constitutional claims fail because MEJA does not offend the separation-of-powers principle or the nondelegation doctrine, equal protection, or due process. Thus, we **AFFIRM** the decision of the district court.

_____

**CONCURRENCE**

_____

THAPAR, District Judge, concurring.  I concur in majority's thorough opinion with one exception.  Having never served in the military, I do no feel qualified to criticize the Army's recruitment and leadership practices.  *See infra* at 10.